ALBANY, Dec. 1835.

American Ins. Company v. Griswold.

---

## The American Insurance Company *vs*. N. L. & G. Griswold.

The *assurer* of goods to a specified amount, shipped on a *trading voyage* under a *policy on time*, where the value of the whole cargo exceeds the sum subscribed, is liable to the full amount of his subscription, if, after the landing of a portion of the cargo in safety at the first port where the vessel stops to trade, the residue of the cargo is totally lost by one of the perils insured against; provided that, at the time of the loss, there are goods on board to an amount in value equal to the sum subscribed, that being the only question in such case as between the *assurer* and *assured*.

Nor can such *assurer*, in case of such loss, *claim contribution* from *subsequent assurers* upon the same cargo, although there was aliment for all the policies at the time of subscription, where the policy contains what is denominated the *American clause* : i. e. a proviso that, in case of any subsequent insurance, the insurer shall nevertheless be answerable for the full extent of the sum subscribed by him, without right to claim contribution from subsequent assurers.[*]

An assured who, after the exhibition of his proofs of loss and interest, presents a statement of his demands *less in amount* than what he is legally entitled to recover, is not *estopped* from claiming a larger amount, if a settlement is not made in pursuance of such statement.

---

[*] See the *dissenting* opinion of *Mr. Senator Tracy*, who holds that the *American clause* in a policy applies only to cases of *double assurance*; that is, where the insufficiency in value to give aliment to the several policies exists at the time of the executing of the policies, and not when it is superinduced by the withdrawal of a part of the subject at risk after the policies have all attached, and the risk in respect to each commenced.

American Ins.
Company
v.
Griswold.

ERROR from the supreme court. This was an action on a policy of insurance made by the American Insurance Company on the 17th May, 1824, whereby they insured the Messrs. Griswold $20,000 for the term of 18 months, commencing on the day of the date of the policy, upon any or all voyage or voyages, in ports, rivers, and at sea, during the 18 months, with liberty to touch and trade at any port or ports as frequently as the captain or agent might direct, upon all kinds of lawful goods and merchandises, laden or to be laden on board the good ship *China :* beginning the adventure from and immediately following the date of the policy, and to continue until the 17th November, 1825. The company were paid for the assurance $7\frac{1}{4}$ per cent. The policy contained a clause that a relative proportion of the premium should be returned for each month not commenced, no loss being claimed ; with permission to extend the risk for six months. It also contained the following clauses : " Provided always, " and it is hereby further agreed, that if the said assured shall " have made any other assurance upon the premises afore- " said, prior in date to this policy, then the said American " Insurance Company of New-York, shall be answerable " only for so much as the amount of such prior assurance " may be deficient, towards fully covering the premises here- " by assured, and the said American Insurance Company of " New-York shall return the premium upon so much of the " sum by them assured as they shall be, by such prior assur- " ance, exonerated from ; and in case of any insurance upon " the said premises, subsequent in date to this policy, the said " American Insurance Company of New-York shall never- " theless be answerable for the full extent of the sum by them " subscribed hereto, without right to claim contribution from " such subsequent assurers, and shall accordingly be enti- " tled to retain the premium by them received, in the same " manner as if no such subsequent assurance had been made." Goods were shipped on board the vessel at the port of New-York, the invoice cost of which, covered at a premium of $7\frac{1}{4}$ per cent., was $47,096,$\frac{76}{100}$, with which the ship sailed and departed from New-York on the 21st May, 1824, destined for South America and the Pacific Ocean. On the 26th May, 1824, the Messrs. Griswold

procured another policy to be underwritten upon the same risk, by the *Atlantic Insurance Company*, for $10,000 for the term of 18 months, commencing 18th May, 1824; and two days after procured still another policy to be underwritten for the same risk by the *Niagara Insurance Company* for $15,000, for the term of 18 months, commencing on the day of the date of the last policy. The latter policies are of similar tenor and effect in all respects as the prior policy, except as to the commencement and termination of the 18 months. On the sixth of October the vessel arrived in the bay of *Callao*, having on the passage touched at *Valparaiso* for information and water, but at no other port after leaving New-York. At Callao a part of the cargo, amouting to nearly $21,000, was safely landed and disposed of; after which, to wit, on the third day of November, 1824, the ship and the residue of the cargo remaining on board, amounting at the *invoice price* to $27,050,04, were forcibly seized by the Spanish military commandant of Callao, and became wholly lost to the owners. Prior to the seizure, $2014 in specie, the proceeds of the sales of a part of the cargo, had been laden on board of the ship, and remained on board at the time of the seizure. The fair *market value* of the cargo on board at Callao at the time of the seizure being $71,076,-02. The Messrs. Griswold expended $965,17, in unavailing endeavors to recover the ship and cargo. Proof of loss and interest was exhibited to the American Insurance Company 22d December, 1825, and on the 2d February following, letters of abandonment were delivered to the several insurance companies. Previous to the exhibition of proof of loss and interest, the Messrs. Griswold submitted their papers connected with the loss to Oliver H. Hicks, an insurance broker, to state the amount of the loss; who accordingly made out a statement, apportioning the loss of the *cargo* as follows: to the American Insurance Company $11,448,15; to the Atlantic Insurance Company $5724,07; to the Niagara Insurance Company $8586,-11; and to the owners, for the uninsured portion of the cargo, $1291,71; and, upon the same principle, divided the sum expended in endeavors to recover

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

the ship and cargo, between the three companies and the owners. The Messrs. Griswold objected to the statement thus made, but notwithstanding submitted it to the several companies on the 13th February, 1826. The *American Insurance Company* would not admit the correctness of the statement, and refused to pay the loss. On the 15th February, 1826, the Messrs. Griswold compromised their claim against the *Niagara Insurance Company* for $7967,13, reserving their rights in all other respects, in the same manner as if no insurance had been made. On the 23d August, 1827, a similar compromise was made with the *Atlantic* company, and $4701,31, accepted. In May, 1826, the Messrs. Griswold commenced this suit, and on the trial of the cause, a verdict was entered by consent for the plaintiffs for $30,000, subject to adjustment of amount due, to be made by Mr. Hicks, the broker above mentioned ; the parties agreeing to appear before him, and that he should make a report stating the facts and principles upon which his report was founded, which either party should have the right to turn into a special verdict to submit to the supreme court. Mr. Hicks accordingly made a report embracing the above facts ; and the further facts, that the *premium note* of the plaintiffs amounted to $1485,96, and that, on the 1st October, 1831, the defendants paid the plaintiffs $5000 on account of the loss. Mr. Hicks also stated that, on the hearing before him, it was *admitted*, by the counsel for the respective parties, that where there are two or more policies on the same cargo and risk of different dates, and interest to supply them all, if a loss, either partial or total, takes place whilst all the goods are on board, the several policies, according to the practice and usage as between the insurers and insured in New-York, contribute to such loss in proportion to the sum insured by each policy ; that the same usage prevails where there are time policies on cargo, and a loss, either partial or total, occurs before any portion of the cargo has been landed ; that the same usage exists where the owner is partly uninsured, so that he contributes to the loss, either partial or total, in the same proportion in which his uninsured interest would contribute if insured ; and that there is *no evi-*

*dence* of any usage in practice as to the mode of settling the loss on time policies on cargo, where there are several policies of different dates, and interest to supply them all at the commencement of the risk ; and where a portion of the goods has been landed, and a loss of or on the residue then occurs, no such case before that on which the present suit is brought having occurred. He concluded his report by saying that, being undecided in his opinion as to the true principles upon which the loss should be stated, as applicable to the defendants, he submitted three several statements, made upon different principles, for the consideration of the court—the *first* similar to the statement exhibited to the defendants on the 13th February, 1826, according to which the *balance* due the plaintiffs would be $9982,87 ; the *second* like the first, except that, before making an apportionment between the three companies and the owners, he charged the whole amount of *specie* laden at Callao to the defendants, according to which the balance would be $10,804,27 ; and the *third*, upon the principle that the goods landed at Callao should first be applied to that portion of the cargo which was uninsured, and then to the policies subsequent in date to that underwritten by the defendants, in the inverse order of their respective dates, *leaving the defendants liable for the full amount* subscribed by them ; according to which statement, the balance due from the defendants would be $22,940,13.

Upon this report the cause was submitted to the supreme court upon written arguments—of which the following is an abridgement.

*H. R. Storrs,* for the plaintiffs. It is contended by the defendants that they are only liable to pay such a proportion of the loss of $27,050,35 as $20,000, the amount of interest covered by their policy originally, bore to the whole interest of $47,096,76 on board when the ship sailed from New-York ; or in other words, that on a policy like this, where the insured has on board at the commencement of the voyage an excess of interest uncovered by the policy which he afterwards discharges from the ship, the policy is not to be considered as *full,* and that it has diminished in the same relative proportion, although an amount of interest is still kept on

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

board and remains there at the time of the loss, equal to the amount covered by the policy : whereas we insist that the plaintiffs are entitled to a *full indemnity to the whole amount of their interest on board at the time of the loss*, without regard to any further interest originally uncovered by any policy, and afterwards discharged from the ship. He contended that this would be the rule even in the case of a *specific voyage* from one port to another, where a portion of the cargo was landed at the port of delivery, and the residue amounting to the sum insured, totally lost before landing. He said that in the case of *The Columbian Insurance Company* v. *Catlett*, 12 *Wheat.* 390, there was an intimation of Mr. Justice Story to the contrary ; but the point did not legitimately arise before the court, nor did the judge profess to examine or decide upon it. All he said was, that if there had been a policy on a specific voyage, and for a single passage, the argument of the counsel *might* justly apply ; but he gave no opinion upon it, and passed it over with that single remark. The owner may stand his own insurer for a risk beyond the interest covered by his policy ; but if he does not choose to risk any interest beyond the amount insured, he may withdraw or discharge it, and reduce his interest to the sum insured. The policy being full as long as the given amount of interest is on board at the time of the loss, the interest of the insurer is to be set down to the full amount of his policy in the apportionment of every loss, total or partial. By considering the policy as an insurance only on a specified *pro rata* amount of the whole interest *originally* on board, the defendants claim that the policy of the insurer is *reduced* at every discharge of the mere surplus interest thus insuring the full amount of interest specified in the policy for the whole voyage, gaining the entire premium, and then claiming a discharge from responsibility, although during the whole voyage the amount of interest insured remained actually at hazard, because a surplus interest on which he was *never responsible at all*, had been withdrawn or discharged. The counsel insisted that although this express question had never been resolved in this state, yet the principle had been fully and clearly recognized as a settled point in the law of insurance in the case of *Davy* v. *Hallett*, 3 *Caines*, 21, where Chief Justice

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

Kent says, " the present case is analogous to that cited in 2 *Valin*, 87, and 2 *Emerigon*, 39, 40, in which one caused an insurance to be made to the amount of 1000 livres upon goods on board a vessel from America to *Marseilles*. The vessel sailed with a cargo to the amount of 3000 livres, and discharged two-thirds thereof at *Cadiz*, leaving goods on board for the remainder of the voyage to the amount of the insurance. It is the opinion of these authors, and the same is confirmed by *Pothier*, that the policy was not thereby *reduced two-thirds* in value, but operated still upon all the cargo on board to the amount of the 1000 livres." If the amount of interest insured remains, the insurer goes the whole voyage with his indemnity attached to such amount, until the whole is safely landed. *Gardner* v. *Smith*, 1 *Johns. Cas.* 143. The rule, however, is of more frequent occurrence in cases of policies to more than one port of discharge, and then it is applied not because there are more ports than one at which the cargo may be discharged either in whole or in part, but on the ground that the risk continues until all the goods are landed. The defendants would tie down the risk to the state of the interest as laden on board the vessel at New-York, and then cut it down as fast as any interest is discharged. When *once reduced*, there is no way of filling up a policy again, without a *new insurance*. This erroneous position was attempted to be established in the case of *The Columbia Insurance Company* v. *Catlett*, in the supreme court of the United States. The policy, in that case, was in the common form of the New-York policies, where more than one port may be used, and the insurance was " at and from Alexandria to St. Thomas, and two other ports in the West Indies, and back to her port of discharge in the United States, upon all kinds of lawful goods and merchandises, laden or to be laden on board the ship called the Commerce," &c. Beginning the adventure upon *the said goods* and merchandises from the *loading at Alexandria*, and continuing the same until *the said goods* and merchandises shall be safely *landed* at St. Thomas, &c. and the United States. The ship sailed with $16,887 32 interest on board. She sold and discharged at St. Thomas, cargo to the amount of $3,512 99, leaving value on board of the ori-

ginal cargo to $12,328 25, with which she sailed for Cape Hayti; and there was a total loss of all remaining on board. The defendants set up the same principle in that case that is now contended for. The insurers' counsel seemed to take it for granted, that such was the general principle of all insurance. But the whole reasoning of the court, independent of the circumstance that it was a trading voyage, goes to repel it on every policy whatever. "The argument on behalf of the company," says Mr. Justice Story, who delivered the opinion of the court, 12 *Wheat.* 394, "is, that as a part of the cargo was landed at St. Thomas, the amount risked by them is to be diminished by their proportion of the cargo so landed. In short, that the loss is now to be made up by them with reference to the value of the whole cargo on board when the risk first attached, and not with reference to the value on board at the time of the loss, notwithstanding it exceeded the amount insured. We are of a different opinion. We think the true intent and object of the policy was, to cover an insurance of $10,000 during the whole voyage out and home, as long as the assured had that amount of property on board. This is not a policy for a voyage to St. Thomas only, in which case the argument might justly apply; but it is a policy to two other ports, on the outward voyage and for the homeward voyage. The language of the policy is, that the underwriters insure $10,000, at and from Alexandria, and two other ports in the West Indies, and back to the United States. The premium is apportioned accordingly, for a half per cent. is to be returned ' for each port not used or attempted,' and the contemplation of the parties manifestly is, that the premium should be paid during the round voyage, upon the full sum insured, and that the assured should have the full benefit of the insurance, as long as he had $10,000 on board." This reasoning, in fact, meets the whole principle of *all insurances.* Is a policy to a particular port until " *the goods*" are safely landed, less than until *all* the goods are landed? Is it a policy on *parcels?* or is not that case, a risk as *entire in itself* as if half a dozen ports where " *the goods*" are *to be landed,* had been inserted? The principle which the defendants assert goes on the ground, that in insurances the policy has reference to the

state of the gross interest on board, at the commencement of the voyage. Now an argument or principle, *drawn from that consideration applies* as well to *trading voyages* and voyages to *various parts* as to a *single part*. On all these policies, the risk is alike *till the goods are landed.* That they are *to be landed* at any one or more ports, does not change this characteristic of the risk. It is a risk *still,* till they are *all landed,* and necessarily as *entire* in the one case as the other. But if we go back to the commencement of the voyage, and fix there a *pro rata* proportion as an *insured proportion* only as the *subject* of the policy, we should reach all cases alike, and cut down all policies alike, on the discharge of any goods out of the ship, at any place whatever. Although no adjudged case can be found on the exact point arising on an insurance for a *single passage* only, we think it is because the principle is too well settled to be a subject of doubt. The point has been fully treated of by *Emerigon,* in his work on Insurance—a work which Chief Justice Abbott has pronounced to be a "very elaborate and learned treatise, in which no subject is discussed without being exhausted."

But it is unnecessary to consider further, what the general principle of all insurance is, and its particular application to a policy on a specified voyage, for a single passage. The policy of these defendants is not of that description. It is on its face on a trading voyage, and at and from all ports and places, and on all goods and merchandises, laden or to be laden on board—on all voyage and voyages, passage and passages, for carrying on trade, for the period of 18 months. It is even more than equivalent to and much broader than the French policies, which contain the clause which is denominated the clause "*de faire echelle.*" This clause is in their policies as follows: "with liberty to the said ship making the said voyage to go *back* and *forth,* to the right hand and to the left, and to make (or use) all ports or stoppages, either from necessity or voluntarily, according to the pleasure of the captain, master or pilot of the said ship." The words "*faire toutes escales*" have given to this clause the name "*de faire echelle.*" It amounts in substance to the privilege of using

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

more points than one as the points of the voyage, in contra-distinction to a single passage with two specified *termini*— or to a trading voyage.

The counsel here made various quotations from French writers, to show that in *trading voyages* a discharge of a part of the cargo at an *intermediate* port, does not exonerate the insurer in case of the loss of the residue, provided that at the time of the loss there remains on board the ship, an amount of goods capable of furnishing aliment for the risk. He particularly cited 2 *Emerigon*, 37, *ch*. 13, § 8, &c., *Valin*, *art.* 36, *h. t. pages* 32, 87, and *Pothier*, *n*. 80, *h. t.* He also insisted that the policy being on time for a trading voyage, the defendants were liable *at all times* within the fixed period, for the *whole amount* covered by their policy, if there were goods on board to that amount *at the time of the loss*; and to show the equity of the rule, he adverted to the amount of premium paid, viz. 7¼ per cent. Being a trading voyage, he urged that the case came directly within that of *The Columbian Insurance Company* v. *Catlett*.

The counsel next insisted that the defendants were responsible to the *whole extent* of the *sum insured* by their policy, i. e. $20,000, in consequence of the clause relating to *prior and subsequent insurances*. He quoted the second member of the clause: "And in case of any insurance upon the said premises, *subsequent* in *date* to *this policy*, the said American Insurance Company of New-York shall nevertheless be *answerable* for the *full extent* of the *sum* by them subscribed hereto, without right to claim contribution from such subsequent assurers, and shall *accordingly* be entitled to retain the premium by them received, in the *same manner* as if *no such subsequent* assurance *had been made*;" and then observed, the words of this clause, its obvious meaning, its plain language, are so extremely clear and express, that it would seem hardly possible to admit of doubt; yet it has been made the subject of doubt by insurers before now, and it has been judicially settled. In the case of *The Columbia Insurance Company* v. *Catlett*, Mr. Justice Story expressly recognized the *settled construction* of this clause. He said in that case, "If the clause, usual in policies in the eastern states, as to priority of

insurance had been here incorporated, and there had been a subsequent insurance, this, as the prior policy, must have first attached to the extent of the sum insured during the whole voyage." By the English rule, all the policies, though of different dates and sums, are considered as of the same date, for the purpose of apportionment of the loss among the underwriters. The introduction of these clauses into our policies was to change that rule, and severs the interests insured and leaves the insurers responsible to the insured in case of loss, without any right to contribution from subsequent insurers. Under the common law rule, the assured is held to contract with all the insurers as of one date, in proportions among them according to the several sums covered ; but these clauses expressly change the contract and abrogate that rule. Washington, J., said, in the case of *Watson* v. *The Insurance Company of North America*, 3 *Wash. C. C. R.* 2, " According to the custom of merchants in England, the loss is to be made up proportionably by the different sets of underwriters; but the form of the policies of this city, (Philadelphia,) and probably of most of the cities of the United States, has prescribed a different rule ; and it is believed, that by a fair construction of the contract which creates this rule, the present question may be decided." The *express contract* has created the rule. It is not a rule settled upon any general principles of the law of insurance : it is the *casus fœderis*, the case expressly contracted for. In the language of Judge Washington, it is the *contract* which furnishes the rule for making up the first insurer's portion of the loss. Accordingly, in *M'Kim* v. *The Phœnix Insurance Company*, 2 *Wash. C. C. R.* 89, the rule is recognized and acted upon as a settled point, admitting of no question or doubt. In *Murray & Mumford* v. *The Insurance Company of Pennsylvania*, 2 *Wash. C. C. R.* 186, the same point is assumed, and the rights of the parties settled accordingly. So in *Kenny* v. *Clarkson*, 1 *Johns. R.* 386, in *Kane* v. *Commercial Insurance Company*, 8 *id.* 229, and *Minturn* v. *Columbian Insurance Company*, 10 *id.* 75, the same principle is admitted. In *Seamans* v. *Loring*, 1 *Mason*, 128, the effect of these clauses came also directly in

**Vol. XIV.**                    52

question. In that case, as the policy was drawn up for successive subscriptions on the same paper by various underwriters at different dates, the effect of these clauses is combined in the form used in that policy, and the interpretation drawn out at length. The same doctrine was held by Judge Story in that case, which Judge Washington and the other courts have uniformly settled on that point ; and it is worthy of notice, that this Boston clause is the same to which he had before referred in the case of *The Columbian Insurance Company* v. *Catlett.* They are all alike, the one resting in two separate policies, as the custom is in New-York to make out separate policies, the other combining both clauses, as only one policy is used for all the subscriptions. The effect, intent and interpretation of both are alike. In the case of *Seamans* v. *Loring*, Judge Story said : " Mr. Justice Kent has sufficiently stated the true meaning of the clause. An insurance prior in date is to exonerate the underwriter, and entitle the assurers to a return of premium ; an insurance subsequent in date is to have no effect at all on the policy." The case in which Chief Justice Kent noticed that point, is in *The New-York Insurance Company* v. *Thomas*, 3 *Johns. Cas.* 1. The return of the premium on these principles is a consequence flowing from the contract with the second insurer. The first insurer returns no premium, if there is aliment enough to feed his policy in full ; but if there is not enough to feed the second, then as the second insurer is exonerated from all that is covered by the first, he shall return the premium for the deficiency accordingly. The principal point stipulated for (the main subject of the clause) is, to fix their liability in case of loss. The return of premium by the subsequent insurers is also provided for as the consequence of certain contingencies, which may affect the amount of their responsibility in case of loss. There can be no over insurance in these cases as to such policies of different dates, till they amount collectively to the whole amount on board. Then the subsequent policies beyond that are off, and have no subject matter at all to fasten upon. The premium is returned of course by such insurers ; for as to them no risk is taken.

Examine the language of this clause in the oldest policy. If any insurance is made " upon the said premises," i. e. on the *cargo on board* or the interest of the assured at risk, " subsequent in date to this policy," &c. " the insurer shall be answerable," i. e. in the event of a loss, to the insured " to the full extent of the sum by them subscribed ;" not to a *pro rata* amount in proportion with other insurers, but to the *full extent of the sum subscribed*—i. e. if 20,000 is subscribed, then as if it had been said to the full extent of $20,-000, " without right to claim contribution from such subsequent assurers"—that is, we have no common interest or pro rata liability with others ; we take that sum absolutely on ourselves, " in the same manner as if no such subsequent assurance had been made" by any other insurers ; " and shall accordingly," as a consequence of this contract, (accordingly) or consequently " be entitled to retain the premium by them received, in the same manner as if no such subsequent assurance had been made." The principles thus settled on policies of this description have an important and conclusive bearing on the question first examined in this argument as to the amount of the insurer's liability, when an uninsured interest has been partially discharged from the ship before a total loss of the goods at risk occurs. The effect of the introduction of these clauses into the policy, is to place the insurances precisely on the footing of the French policies. The English rule of law, which would have treated them all at first as a joint policy, and graduated the interest in each insurer according to the amount of his subscription is abrogated ; and every policy containing these clauses takes its full effect, with full interest according to its date. This is the express contract, and cannot be varied. The subsequent policies are, in relation to the first, to be thrown out of the question in case of loss ; or, in the emphatic language of the contract itself, " in the same manner as if no such subsequent insurance had been made." The French rule is thus expressly adopted ; and though even under the English law on the ordinary policies, the original uninsured interest is not taken into the account at all, in the case of a total loss like the present, where there is aliment still on board to feed the policy ; yet when

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

these clauses are inserted, every pretext for calling in that interest to alleviate the insurer's loss is swept away. The effect of the rule set up by the defendants on the policy in question, would be to place the eldest insurer in a better condition, and to expose him to less risk than if the whole surplus interest had been actually insured by similar subsequent policies. The owner is thus denied even the condition of a subsequent insurer. He is not to have the privilege of standing even in the character of " his own insurer," stricly of his own uncovered interest ; for if it had been actually insured, the subsequent insurer after this policy would have been expressly exonerated from all risk, in case of total loss, as to an amount on board equal to this eldest policy. The owner, then, of the uninsured interest, stands in relation to this eldest policy of the defendants according to their doctrine, in something more than the light of a second assurer, and in a far worse condition. It is believed, with some confidence, that no such principle can be successfully urged ; yet it comes directly to that point. If the plaintiffs had in this case insured by a second policy the whole surplus interest originally on board, these defendants would, according to the rule which has been established on such a policy in all our courts, have been responsible for the whole amount of their policy, without regard to any second policy. But as the plaintiffs have left a part only uncovered, they seek to call him in to share their risk, when they could not have called in a second insurer. They require the plaintiffs to contribute to their loss, when they have expressly contracted that they shall have no right to call upon any second insurer for contribution ; and this doctrine is set up against the party with whom they have made that express contract. Before the defendants can establish that principle, they must therefore show that the plaintiffs were something more than a second or subsequent insurer in relation to an eldest policy containing that express stipulation.

Every principle in relation to the uninsured interest which has been elaborately considered by Emerigon, Valin and Pothier, peculiarly apply in all their strength to policies of this kind. The defendants stand exactly in the position of the

first insurer under the French policies. They are interested, indeed, that there should be kept on board a surplus, that they may make others participate in partial losses and averages and to that extent alleviate their burden. But this pecuniary interest is not a legal right, as all these writers very justly observe. There is no strict partnership with subsequent insurers or the owner. If there was any doubt at all in the case of a total loss under the English policies, where part of an original uninsured interest remained in the ship, the whole ground on which that doubt could have rested, is swept away by the introduction of these clauses into the policy. The English rule would have rested in that case, if it had existed at all in the case of a total loss, on the ground that all the insurers and the owner were to participate in every kind of loss according to their original interest, for the whole voyage round ; and that is the exact principle assumed by the defendants and on which they rest that part of their case. But the whole foundation of such a construction of these policies is swept away by the express contract of the parties. The whole reason urged for such a rule and on which it would have rested, if it had ever existed, fails to reach this policy, and is totally inapplicable to it. In case of over insurance, this eldest policy does not divide the premium with other insurers. It retains the whole premium absolutely, under all contingencies. For that end too, it systematically excludes all the surplus interest from all participation in the amount which it covers. Would these defendants have returned any part of the premium, if there had been subsequent policies to double the amount of the whole original interest ? Not a farthing. They would have replied, " We are expressly answerable in case of loss for the whole amount subscribed ; we have stipulated that no others are to contribute to us in such case as to that full amount ; and we made it an express stipulation, which naturally flowed from that contract, that we were accordingly to retain the whole premium."

The consequence of these views of the case is to place the insurers on such policies as these, exactly within all the general principles so clearly illustrated by the French writers. We have in their treatises a full examination of the na-

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

ture of this contract (a contract exactly like the present) and an ample exposition of the liability of the insurers, naturally flowing from their undertaking. But if this exposition of this contract were wanting and authority had not settled it, it would still be enough to say that such is the express contract itself on its face. What the French and English policies have not said on their face as to the uninsured interest, but left to the general principles of the indemnity, the contract of these defendants has expressly provided for and concluded them from disputing by their own positive stipulation. To them it is the same in the case of a total loss where aliment remains on board to feed their policy, as if no surplus interest had ever existed. But the treatise of Emerigon on the point of a discharge of part of the interest uninsured, is not in relation to any peculiarity existing in the French law. It is on the nature and extent of the indemnity undertaken, on first principles. The opinions of writers like Valin, Pothier and Emerigon, are of great and deserved weight. They are interpretations, containing the sense of the commercial world on the subject. If it was, however, even a peculiarity in the French law, yet since these clauses would reduce the case exactly to the predicament of the French policies, we should still call in the doctrines supported by such men as expressing the sense of the mercantile world. See opinion of Judge Story, in the case of *The Franklin Insurance Company* v. *Lord*, 4 *Mason's R.* 253, 255. In that case, a case on a *respondentia* bond, he referred to their illustrations of the French law in a parallel case, so far as they reached the general principles on which that contract rests, on a point in which the two cases stood in the same predicament. But we do not admit that this is a peculiarity of the French law in the case of a discharge of the surplus uninsured interest, in case of a total loss. It is the general principle every where of the indemnity undertaken, where aliment remains to keep the policy full ; and the exposition of the extent of that indemnity in a case of total loss drawn from the nature, intent and object of the contract.

The adjustment of the loss must be made up by taking the amount on board at the time of the loss. If it was equal to the sum covered, the defendants are liable to pay

that amount. It is altogether immaterial whether the proceeds of that part of the cargo sold at Callao is taken into the account or not. There was still enough left on board, of the original interest to keep the policy full. The plaintiffs are therefore entitled to judgment for $20,000 and interest, deducting the payments which have been made and the amount of the premium note, with interest allowed accordingly on the credits.

It appears from the case, that when Mr. Hicks originally made up the apportionment of the loss on this policy, he took all the policies as of one date and risk, without regard to the special clauses inserted in all of them, and charged the plaintiffs also with a *pro rata* loss on their original uninsured interest without regard to the principles established in such case, and totally overlooking the cardinal and controlling fact that this was a policy on a trading voyage and on time. The plaintiffs offered that adjustment to the defendants, but they refused to pay any thing and never acceded to it. This proposition, offer or demand, is therefore of no moment. Not having been acceded to, it is no adjustment and binding on no one. The defendants must now be answerable according to the rules which the law applies to their contract.

*J. Duer & S. P. Staples*, for defendants. The plaintiffs insist they have a right to recover the full sum named in the policy, without reference to the part of the cargo landed, as there was property remaining on board at the time the loss happened, to an amount equal to the amount named in the policy. The defendants insist, that the plaintiffs are entitled to recover only such portion of the sum insured, as the amount of the policy bears to the amount of the whole cargo. This right of recovery to the full amount of the sum named in the policy is placed on several grounds. The first is upon general principles applicable to all open policies on cargoes situated as this was at the time of the loss. The second ground is, that this is a policy on time and upon a trading voyage. The third is upon the ground of the *proviso* referring to policies prior and subsequent in date.

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

1. As to the first ground. That without reference to this being a time policy, and without reference to that portion of the cargo landed and in safety, the plaintiffs have a right to recover the full amount named in the policy, there being that amount of property on board at the time of the loss. If this ship had been totally lost at sea, with all her cargo, before she had arrived at any port, or delivered any part of it, each of the underwriters must have paid the amount of his policy, and the owners must have lost the balance. If the vessel had met with a disaster, and her cargo had been partially lost or injured, it is well settled law that each underwriter must have paid in proportion as the sum by him insured bore to the whole amount of the cargo, and the owner must have borne the loss upon his uninsured part in the same proportion. This will probably be admitted. If the loss on the cargo should amount to seven-eighths or fifteen-sixteenths of its value, the rule would be the same. But it is insisted that if the vessel with her cargo arrives in port, and a loss there happens after the landing has commenced, the rule is different. It is admitted that the difference is sanctioned by no adjudged case ; at least that the point has never been decided. It is admitted that at the time the policies were executed they all attached, there being more than cargo enough on board to supply all the policies, and upwards of $2000 left uncovered, and at the risk of the owners. If the China had been met at sea by an armed force, and the same amount of property taken from her, all must have borne the loss equally. So if the loss had happened by the perils of the sea. If while the China lay in the bay of Callao, and before any portion of her cargo had been landed, it had been lost or damaged, to the amount of three-fourths or seven-eighths, each must have paid in proportion as the sum insured bore to the whole amount of the cargo. The rule contended for by the plaintiffs is erroneous in principle. It goes upon the idea that each insurer takes a particular part or portion of the cargo ; whereas he insures so much on the whole cargo. If, therefore, any portion of the cargo is lost, the underwriters suffer. If any portion is saved, it in like manner operates for their benefit. The plaintiffs have no right to say that the part of the cargo landed was the uncov-

ered part of the cargo, or the part insured by the owners. This would be against a leading principle of marine insurance, which distinguishes it from a fire policy. In a marine insurance, the policy is upon a part of the *whole* cargo, and not upon the *whole* of a part of the cargo, and this is a governing principle throughout, and not to be changed or departed from, unless upon stipulations contained in the policy itself requiring it. The analogies and symmetry of the law of marine insurance, require that the rule contended for by the defendants should be applied to this case. If the loss had happened at sea to the same amount before any portion of the cargo had been landed, it is agreed that each underwriter must have paid in proportion as the sum by him insured bore to the whole amount of the cargo, and the owner must have borne the loss upon the uninsured part of the cargo in the same proportion. It is conceded that any partial loss must have been settled upon this principle. Suppose that while the China lay in the bay of Callao, and before any portion of her cargo had been landed, the cargo had been damaged by a storm to the amount of 50 or 75 per cent., would not each underwriter and the owner have shared in the loss? Would not the rule be the same after a part of the cargo had been landed? Suppose the cargo amounted to $15,000, the policy to $10,000, leaving $5000 uncovered and at the risk of the owners, and after $5000 worth of the cargo had been landed, a damage happens to the cargo of $5000, would that $5000 be paid by the underwriters without any reference to the original amount of the cargo? would not the loss be settled in the same manner as it would have been, had the loss happened at sea? Upon what principle is it that a distinction is attempted to be made between a loss happening to a cargo in port, after a part of it has been landed, from a loss happening to the same cargo under the same circumstances before any portion of it has been landed? In the latter case all agree that the owner must contribute. In the former it is insisted that his share has been landed, and he shall not contribute. Why should not the landing of a part of the cargo make for the benefit of

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

the underwriter as well as the owner? See *Phil. on Ins.* *p.* 329, where he states, that in regard to goods, it is a general rule that if a part of the subject insured is withdrawn from the perils insured against, the insurable interest is proportionably diminished. How can the owner say to the underwriter, the part saved is mine, and the part lost is yours, and I abandon it to you? Might he not as well say *this after a partial loss happening at sea,* and before any part of the cargo has been landed?

Upon what principle is it that the assured can say to the underwriter, although by the landing in safety a portion of the cargo, your policy covers a less amount of property, yet the amount of interest insured and the extent of your liability remain the same? We insist that as far as the cargo is landed, the underwriter is relieved. The plaintiffs insist that the landing of any portion of the cargo is no relief, so long as an amount remains on board equal to the amount named in the policy. That as the cargo is landed, the policy varies in its extent, but deepens in its interest. We insist that when a policy once attaches to a cargo it remains so attached, and neither recedes nor expands, but as the cargo is delivered the policy is relieved *pro tanto.* If the policy is on time or for a trading voyage, and its provisions be apt for that purpose, it may be relieved from cargo as it goes out, and attach to new cargo as it comes in; but when once attached it remains so till relieved, and is relieved *pro tanto* by every delivery of cargo. These are considered by the defendants as the sound principles of the English and American laws of insurance. But several authorities have been cited with a view to vary or shake these principles.

The first case is that of *The Columbian Insurance Company* v. *Catlett,* 12 *Wheaton,* 339, which is cited more than once by the counsel for the plaintiffs, in different parts of their argument. The court decide that it is a policy on $10,000 round, and that such is the fair import of the language of the policy, and therefore the underwriters must pay $10,000, if that amount was on board at the time of the loss,

and lost by reason of the perils insured against ; but they also say that if the voyage had been to St. Thomas only, then the argument, that in settling the loss reference must be had to that portion of the cargo which had been landed at St. Thomas might apply. So far as this case bears upon the point now under consideration, it supports the argument of the defendants. The loss took place after the vessel had left St. Thomas, her first port of delivery ; but in the present, it took place at Callao, where the vessel first arrived and began to discharge her cargo ; i. e. it took place during the continuance of the first voyage covered by the policy, and before the commencement of a second risk.

*Davy* v. *Hallett*, 3 *Caines' R.* 16. This was a valued policy on freight, out and home. A question was made whether the policy was so expressed as that it was for $2000 out and $2000 home, or only $2000 out and at home —that is, $1000 on each voyage ; and the court examining the words of the policy, say that it means $2000 out and $2000. The vessel earned her $2000 freight on her outward voyage, and received her money ; but on the return was taken one day out, and the assured abandoned. The question was, whether he should recover for the $2000 home, and the court decided in the plaintiff's favor. It is difficult to see that the points decided in this case have any material bearing on the point now under discussion. Probably the case is cited for the sake of bringing to view a case stated from the French law by the then Chief Justice Kent, found in Valin and Emerigon, which will hereafter be considered.

*Gardner* v. *Smith*, 1 *Johns. Cas.* 141. This was an action on a policy of insurance on goods, at and from New-York to Jamaica, and twenty-four hours after the goods were landed. They all arrived, and a part were landed. After they had been landed more than twenty-four hours, they were all seized, both those on board of the ship and those landed. One question was, whether the underwriters were discharged till all the goods had been landed twenty-four hours ; and the court decided that the policy meant that the whole cargo should be landed twenty-four hours

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

before the underwriters should be relieved from any part of the risk. They say the policy applies to no particular part of the cargo. Another question was, whether the loss was so far total as to allow the assured to abandon; and the court decided that it was. We do not perceive that the points decided in this case have any material bearing upon any question at issue in this case. So far as the case shows that the policy can apply to no particular part of the cargo, it is in favor of the defendants.

It is said by the plaintiffs' counsel, that the premium paid in this case, $7\frac{1}{4}$ per cent., shows that the risk was for the whole voyage. There is nothing in the case which shows that this was an unreasonable or unusual premium upon the risk, understood as the defendants' counsel understand it.

The learned counsel opposed to us have indulged pretty freely in extracts from the speculations of French writers on the law of insurance. We do not perceive from these extracts that the question is settled, even in the French law; and if it was, it would have very little influence in determining the question against the settled analogies of our own law. In *Winter* v. *Haldiman*, 2 *Barn. & Ald.* 649, 22 *Eng. C. Law R.* 155, Lord Tenterden, in remarking upon a case of insurance then under consideration, where no precedent was to be found in point, and where he had been referred to the French law, says: In this country, if we " should depart from usage and decisions, and, instead of reasoning upon them, should look to abstract principles, we should resolve things into their first elements. Laws and usages vary in different countries, on this as on other subjects." In this country many losses are considered losses by the perils of the sea, which are not so in France. In some countries negligence and want of skill is considered barratry. Not so here. In this country, the premium of insurance is considered a part of the goods, and as such insurable. Not so in France, unless by a particular provision. Perhaps the *differences* between our law and that of France are quite as great as the *similarities*.

II. The next ground on which the plaintiffs rest their claim is, that this is a policy on time and for a trading voyage; es-

sentially different, say the plaintiffs, from a policy for a specific voyage, where the *termini* are named. This is not a policy from place to place, but from such a time to such a time, during which time the ship may go where she pleases, take on board what cargo she pleases, and discharge it when and where and in such parcels as she pleases. In these and perhaps in some other particulars, this policy is essentially different from the common policy, on an ordinary specific voyage. But what bearing have these differences upon the point in controversy in this case? Before the circumstances are considered of any importance, it is necessary to show their bearing upon the point in controversy. All these circumstances may exist, without affecting in the least the point in question. The doctrine we contend for, that in settling a loss reference shall be had to the whole cargo, is just as applicable to this policy on time, as to any other. The only difference relating to the point in question is, that this policy does not, like a common policy, become *functus officio*, when one cargo to which it has been attached has been laden on board and delivered in safety. The policy in question will attach to any cargo or any number of cargoes taken on board during the eighteen months, and will be discharged at the close of the time, whether the cargo then on board be delivered in safety or not. But the responsibility of the insurers on the cargo, during each voyage, must be determined by the same rules as if that voyage had been alone and specifically insured. There may be successive risks, but the liability in each is the same. The law which fixes the obligations and rights of both parties, during the continuance of a distinct risk, is not changed because several such risks are embraced in one policy, instead of being separately insured. If we depart from this principle, we must be involved in endless uncertainty; for where are the rules to be found which govern policies on time and on trading voyages, as distinct from ordinary insurances? If the well known and established law of insurance is not applicable to policies of this description, they must of necessity be abandoned, notwithstanding their convenience in practice is esteemed to be such, that their use is daily extending. They

must of necessity be abandoned, since the parties, both insurers and assured, will have no means of knowing either their duties or their rights, until the new law of insurance by which they are to be regulated, the existence of which has been hitherto unknown and unsuspected, shall be promulgated. When a partial loss happens on a policy on time like the present, it must be settled as other partial losses are settled, and the underwriter must pay upon his policy in proportion as the sum insured bears to the whole amount of the cargo laden on board. Every new port at which the vessel takes in cargo is the commencement of a new voyage, for the purpose of testing the extent of the cargo to which the policy attached. This rule is common in policies on time. In a time policy on the vessel, every new port at which the vessel takes in or discharges cargo, is the commencement of a new voyage in such a sense that the vessel must be made seaworthy at every such port. Suppose an open time policy for $15,000 to run eight months on cargo or cargoes whenever taken on board, and the vessel sails from this to New-Orleans with a cargo of the value of $15,000 on board, and there discharges $10,000 of her cargo, and takes in $10,000 more of cargo for Liverpool, and a total loss happens, it is quite obvious that the underwriter must pay the value of the cargo covered by his policy, being $15,000. Suppose that, instead of $15,000, $20,000 of cargo had been taken in at New-Orleans, and a partial loss had happened on the voyage from New-Orleans to Liverpool; must not the owner pay his proportion of the loss, in proportion to the uncovered part of the cargo, and the underwriter pay in proportion as $15,000 bear to $20,000, the same as on a common policy? Suppose a damage had happened to the whole cargo while in port at Liverpool, and before any portion of it had been landed; must not the insurer and the owner pay in proportion to their respective interests, considering the owner his own insurer to the amount of the cargo not insured? Suppose a total loss in port, must not each, the underwriter and the owner, bear it in proportion to his interest? Suppose a part of the cargo, to the amount of $5000, has been

landed, and the remaining $15,000 on board is totally lost; what right has the owner to say that portion of the cargo which was landed and saved is the interest on which I stood my own insurer, and that part lost is the portion on which the underwriter stood insurer? Can he say this with any more propriety on a policy on time, than on any other policy? As respects the point now under consideration, the rule must be the same as in a common policy on cargo from one port to another. It is not sufficient to say that because this is a policy on time, therefore the rules for settling a loss must be different. It must be shown that this circumstance renders a different rule necessary and proper, which we think has not and cannot be done.

It is again said, under this head of the argument, by our opponents, that the amount of the premium, $7\frac{1}{4}$ per cent., shows that their rule of construction must be correct. This is said upon the supposition that we contend that a time policy can attach to one cargo only, and then becomes *functus officio*. But this is a mistake. We contend for no such thing. The policy attaches to every new cargo during the time it has to run. All fire policies are time policies, and in this respect marine policies on time are like them ; but the loss is to be settled as a marine loss, and not as a fire loss.

But in the next place the plaintiffs insist that this is a trading policy, giving the assured liberty to touch and trade at any and all places within the period of time for which the policy runs. It is undoubtedly so ; but this does not affect the point in controversy, namely, how is the loss to be settled? and in what proportions and by whom is it to be borne? Our construction of the policy allows the assured to touch and trade as often as he pleases, and to take in and discharge cargo as often as he pleases; but we do not thereby agree, that when we insure a part of a cargo, if it is lost we will pay for the whole ; nor do we thereby agree to a change of any of the established rules of settling losses. The case cited from 1 *Brod. & Bing.* 426, 5 *Eng. Com. Law R.* 134, only proves what has been conceded in this case from the beginning, namely, that this policy allowed the insured to touch and

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

trade. Undoubtedly in this case there can be no deviation arising from delay or any other cause ; but how does this difference from the common policy show that there is to be a different rule for settling a loss when it happens ? That this loss is to be settled upon the principles contended for by the plaintiffs, because they have shown that the policy is a time policy or a trading policy, is a *non sequiter*. Even if the plaintiffs were right in the points hitherto discussed, it would only follow that no portion of the loss ought to be charged to them on the ground that they were partly uninsured ; not that it ought to be borne by the several policies, (all of which had attached,) in proportion to the sums which they respectively insured. For the purpose therefore of establishing that the defendants are liable to the full extent of their subscription, and the subsequent policies only for the surplus, it is next contended that *this is the prior policy, and as such must be first exhausted.* If it had been intended to have made the underwriters liable for whatever amount might have been on board at the time of the loss not exceeding the policy, how easy would it have been to have said so. That no such declaration is found in the policy is pretty high evidence that no such intention existed at the time it was executed.

III. This is the oldest policy, having been executed on the 17th day of May, 1824. The ship sailed on the 21st day of May, and at the time it is said no other policy had been executed. There was no prior insurance. In this policy is the common clause inserted in the American policies as to the other policies on the same subject, prior or subsequent in date. In this policy it is declared that the underwriters will be responsible for the full amount, without right to claim contribution. This proviso, soon after the revolution, was inserted in the American policies to avoid the rule adopted and well settled in England, that where a *double insurance* is made, all the underwriters must contribute in proportion to the sums for which each policy was subscribed, without reference to which was first or which last in date. " Double insurance is" where the insured makes two insurances on the same risk, and the same interest. The two policies are considered in England as mak-

terms of the proviso. It is to have a reasonable and a sounding but one insurance." *Thurston* v. *Hock,* 4 *Dall. R.* 348. 1 *Marsh. R.* 146. " The assured may recover the amount of the loss of either, but he can take but one satisfaction. He can receive only the amount of his loss. A double assurance does not allow the assured to demand a double satisfaction. This would be against first principles." 1 *Cond. Marsh.* 146, *n.* In France, if there be several policies on the same cargo, and same interest, the first shall be preferred. If there be an over insurance in one policy, it shall not be reduced rateably upon all, but the latter insurers shall withdraw on receiving half per cent. In Holland it is still different. To settle the rule in the United States, in cases of double insurance, most and now perhaps all the offices have introduced the clauses in question into their policies. The avowed object, and the real object, and *the only object of the clause, was to vary the English rule where a double insurance had been made*—that is, where the same interest had been insured twice over; and *in such* case the proviso does vary the rule, and does away the English rule by which contribution is claimed—and so far it was intended the proviso should go, and no farther. It never has been carried farther in practice, or by any judicial decision. The proviso has no application to a case where there is no double insurance, and where the same interest is not insured twice over. Where the value of the cargo is equal in amount to all the policies, this clause has no application ; for then there is interest to supply all the policies, and each underwriter runs his own risk, and earns his own premium. Because there are two policies on the same cargo, it by no means follows that there is a double insurance, or treble insurance if there be three policies on the same cargo. In the case before the court, there are three policies on the same cargo ; but can our opponents show that there is a double insurance ? In case the cargo had been lost, the value was sufficient to enable the assured to call upon each underwriter to pay the full amount of his policy. When we examine the object and reason of the clause in the American policies, the whole foundation of our opponents' argument fails. No light is thrown upon this subject by the attempt to put a literal construction upon the

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

construction to effect the object contemplated, and is not to be forced or tortured, with a view to effect an object not intended by the parties. Suppose a cargo is shipped from this to Liverpool of the value of $35,000, and A. insures $10,000, and B. $10,000, and C. $10,000, and $5000 is left uncovered at the risk of the owner, and a loss happens on the voyage by a damage to the cargo to the amount of $15,000; how and by whom would this loss be borne? Each policy would contribute to the loss in proportion as the amount insured by each bore to the value of the cargo, making the owner contribute in the same ratio, so far as he stood his own insurer. This is the universal practice, and is admitted to be the rule. In such case, all agree the proviso has no application, and no construction of it however literal or liberal, can give it any just application; and the reason is, this is not a double insurance, and therefore the application of the proviso is not called for. The above is the rule in case of a partial loss. All agree it is the rule in case of a total loss, where are all the policies are full. And why does not the same rule apply, where all the policies have been once full, and a part of the cargo has been taken out and the rest totally lost? The principles of analogy seem to require it. The case of double insurance has not occurred. The proviso is therefore not called for any more in the above case, than in the case of a partial loss. How can the Atlantic or Niagara company say, that the part of the cargo landed at Callao was the portion by them insured, or was exclusively the interest which they insured, and was landed for their benefit? Is there any thing in the proviso which provides for this case?

The conduct of the plaintiffs shows that this claim now set up is an after thought. When the broker, Mr. Hicks, made up and stated the loss, it never entered into their minds that such a claim as this could be made. The broker therefore made the statement in the usual or common way, and upon the common well known principles adopted in all analogous cases. It appears indeed, from Mr. Hicks' statement, that the plaintiffs objected to his statement; but it does not appear that it was on the ground now by them assumed, or that this ground was thought of or mentioned at that time.

On the contrary, it is manifest that it was not on that ground, for the plaintiffs presented Mr. Hicks' statement to the other companies, and called upon them to pay accordingly; and they did pay or compromise, upon the ground that the statement was correct. It is well known that for a long time this whole loss was resisted by all the offices, on grounds distinct from any now in question; and it does not appear that until after two of the offices had settled and paid, this ground of claim now set up against the defendants was ever put forth. The statement of Mr. Hicks, on which the plaintiffs received the money from the Atlantic and Niagara offices, is not only different, but inconsistent with the present claim. If we are to pay the full amount in our policy, then the plaintiffs get more than an indemnity.

<div style="float:right">ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.</div>

| | |
|---|---:|
| The amount of the loss as stated is - | $27,000 00 |
| | |
| The Niagara has paid   o   o   o | $7,009 62 |
| The Atlantic paid   -   -   -   - | 4,701 31 |
| If we pay   -   o   o   o   - | 20,000 00 |
| | $31,710 93 |

It will make near $32,000. This shows that the plaintiffs, in claiming and settling their loss with two out of the three companies, adopted without hesitation and acted upon the principles of contribution which we insist are correct. Admitting for the present that this step taken by the plaintiffs is not conclusive against them, yet, when we see merchants of so much intelligence, and so extensively engaged in commerce, adopt and act upon the principles which we contend for, in a case against their own interest, we think it affords very high evidence of what the settled understanding of merchants is, namely, that the proviso has no application to a case like the present. There is another fact equally decisive to show the understanding of the plaintiffs: the same premium, as appears by the statements of Mr. Hicks, was paid to the Atlantic and Niagara companies as to the defendants, clearly showing that it was believed at the time, by all the parties, that when the policies attached, the companies would all be liable for the same risks; yet it is obvious that, upon

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

the construction now contended for—that by the landing of cargo the subsequent insurers are first exonerated—the risks under the prior policies are vastly more extensive. It is not proved or pretended that any loss like the present has ever been settled or paid upon the principles now contended for by the plaintiffs. No such claim has ever been insisted upon, and therefore never resisted. And we believe, for that reason, no case can be found where a claim like that now made by the plaintiffs has been advanced or presented for adjudication. What was said by Judge Story in 12 *Wheaton*, 394, was a mere *obiter* opinion, casually thrown out. No such point was before him. That was not a case of double insurance.

We will now examine some of the authorities cited on this point by the plaintiffs' counsel. The first is *Watson* v. *The Insurance Co. of North America*, 3 *Wash. C. C. R.* 2. The principles established in this case, so far as they have any bearing upon the point under consideration, are the same we have admitted and labored to establish. The case did not present the point now in question, and the judge had no reference to it in his remarks. *M'Kim* v. *The Phenix Insurance Co.*, 2 *Wash. C. C. R.* 89. This case turned entirely upon the express stipulation in the second policy, and the point now in debate did not come before the court, nor was it considered by the court. *Kenny* v. *Clarkson*, 1 *Johns. R.* 385. The only point in this case having any relation to the present is thus expressed in the marginal note : "Where a vessel was valued at $2000, and insured at that sum, and there was a prior insurance for $3000, the assured was allowed to prove that the vessel was worth enough to cover both policies." It is not perceived that this point has any bearing on the present. *Kane* v. *Columbian Ins. Co.*, 8 *Johns. R.* 229. The loss was total by capture, and the point now in question could not and did not arise. The great question was as to the effect of an agreed valuation of certain goat skins, and whether the value of the whole was sufficient to fill both policies. The other authorities cited have been examined, and unless we are mistaken, they throw no light on the point now under consideration— much less do they decide it. The question remains open, and is to be settled on principle ; and we think sound

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

principles require that it should be decided in favor of the defendants. The case of *The Columbian Insurance Co.* v. *Lynch*, 11 *Johns. R.* 234, throws some light on the point in question, and to some extent the force and meaning of the proviso in question are there examined. It cannot be denied that the elaborate argument of the plaintiffs' counsel is skilfully framed to divert the attention of the court from the questions on which the liability of the defendants for the loss as now claimed principally depends. Great ingenuity is exerted and much learning displayed to establish the doctrine, that under a policy on goods the underwriter continues liable to the assured during the continuance of the risk for the whole amount insured, provided goods of a similar amount in value remain on board; and consequently that in such case the only effect of the landing of a portion of the cargo, on which the policy had once attached, is to shift the subject of the insurance, not to diminish the responsibility of the insurer. Admitting, for the sake of the argument, that such is the rule, and that it is applicable to the present case, what is the effect? Merely that the plaintiffs are not to bear any portion of the loss that has occurred, and that the whole is to be cast on the insurers; but the great question, in what proportion it is to be charged on the different policies, still remains; and on this question we must be pardoned for saying the learned argument of our opponent has cast very little light: the discussion is not met, but evaded.

That the rule which the learned counsel has sought to establish as between the assured and the underwriters, is applicable in England between insurers on policies of different dates, so that the subsequent insurer is discharged by a landing of a portion of the cargo, in the same manner and to the same extent that the assured himself would be discharged, is not pretended. The rule in England is perfectly well settled; it is not denied, but is in effect admitted by the learned counsel himself: it is, that two or more policies on the same cargo and risk, contribute rateably to every loss that may occur, without reference to priority of date, and this whether at the commencement of the risk there is interest enough to supply all the policies, or the whole value of the cargo is sufficiently

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

covered by one. This rule is still in force, except so far as it is abrogated or altered by the new clauses peculiar to American policies relative to prior and subsequent insurances. If these clauses embrace the present case, the defendants, as prior insurers, may be liable for the whole sum insured by their policy. If they do not, they can only be liable for a rateable proportion. The argument of the learned counsel on this branch of the subject, we must be pardoned for saying is somewhat obscure. He is indeed explicit in asserting that the clauses in question are applicable, and that such is their established construction, according to the cases he has quoted; but how these new provisions can be interpreted so as to embrace the present case, and how that interpretation is supported by the cases to which he has referred, the learned counsel has scarcely attempted to explain. We must however understand him as meaning to say, that the English rule of rateable contribution is abolished in all cases whatever, and that, under our policies as now framed, the subsequent insurers can never be called to contribute at all until the prior policy is exhausted: in other words, until the prior insurers have paid the whole amount of their insurance. We must thus understand him, since by no other interpretation can the clauses in question be made to embrace the present claim; yet, if such was the meaning of the counsel, his construction is not only not supported by the cases to which he has referred, but is even contradicted by the admissions he has himself made.

The clauses relative to prior and subsequent insurances, it seems to us can admit only of one of two interpretations; they either abolish the English rule in toto, or the abolition is confined to cases of double insurances properly so called. If the abolition is entire, then the second insurer is discharged in all cases where the amount of the loss does not exceed the amount insured by the prior policy, and in no case is liable for more than the excess. If it be confined to double insurances, then the subsequent insurer is only discharged when the amount of the first policy at the commencement of the risk is equal in value to the goods insured, or is liable only for the sum which the prior insurance is insufficient to cover, and the English rule of contribution is changed by preventing the subsequent

policy from attaching at all, in whole or in part. That this last is the true and sound construction is manifest, 1. From the terms of the clauses themselves; 2. From the usage that has obtained since their introduction; and lastly, from the very decisions to which the learned counsel has referred. If the terms of the clause relative to subsequent assurances be separately considered and literally construed, they undoubtedly seem to favor the interpretation of our learned adversaries, by making the prior insurer in every case of loss answerable for the whole amount of the policy, without any claim for contribution from the subsequent policy; but no argument is requisite to show that the two clauses are to be construed in connection, since it certainly was not intended that the prior insurer should be solely liable, except in cases where the subsequent insurer is wholly discharged. Now by the first clause the subsequent insurer is only discharged where the amount of the first policy is sufficient fully to cover the premises insured. The premises assured are the goods on board at the commencement of the risk. If they exceed in value the amount of the first policy, the second attaches; and having once attached, by the general rule of law is proportionably liable for all losses on those goods subsequently occurring. Thus taken in connection, the evident object of the clauses is to fix the relative liability of prior and subsequent assurers at the commencement of the common risk. The case which they contemplate is a deficiency of interest to supply all the policies at that time. They operate by exonerating the subsequent insurers to the extent of that deficiency, and by thus discharging them, and retaining the entire liability of the prior insurers, the common law rule of contribution is altered, *and no further*. The clauses have their effect by preventing the subsequent policies from attaching in whole or in part on the risk embraced in all; but they contain no provision for exonerating the subsequent insurers, or changing their relative liability, where the policies having once attached, the interest which they cover is diminished during the continuance of the risk. Here therefore, the English rule still applies, that the respective insurers without reference to the time of their subscription until the termination of the risk, are responsible for all

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

losses in the same proportion in which they would have been responsible for a total loss at its commencement.

Without dwelling on other parts of the clauses in question, the provision which they contain as to the return of premium is of itself sufficient to establish our interpretation. The provision evidently implies that the deficiency of interest to which the clauses relate, and which is the sole contingency on which they are meant to operate, is of such a nature as to render a return of premium properly demandable by the assured. The words are express, that where the subsequent assurers are exonerated " they shall return the premium on so much of the sum by them assured, as they shall be by such prior assurance exonerated from." Now a return of premium for *short interest* is never demandable unless the deficiency exist at the commencement of the risk. The insurer is always entitled to retain the premium where the risk is entire and the policy has once attached. He is always entitled to retain where he could at any time have been liable for total loss, to whatever extent his liability may have been subsequently diminished—and this rule is so familiar that it is needless to cite authorities in its support. It is stated in all the elementary writers, and is recognized in nearly all the cases where a return of premium has been claimed. The provision authorizing the prior insurer where he remains solely liable, to retain his whole premium, is equally decisive. What is the meaning or utility of this provision ? Why was it inserted ? Why was it deemed necessary to say that the first insurers where their policy is full, shall retain their whole premium ? There is but one answer. It is to the case only of a double insurance that the provision can apply. It is for the purpose of changing the *English rule in that case* that it is alone necessary. Where at the commencement of the risk there is interest to supply all the policies, the prior insurer is of course entitled to retain his premium. No agreement is necessary to give him that right ; but where the subsequent policies are in effect a double insurance—where they attach not only on the same cargo and risk, but on the same interest, then the assured, although he cannot recover a double satisfaction, may determine the loss to either of the policies, and if a proportion only is recovered of

the prior insurer, he is liable of course to return a proportion of his premium. It is truly said that in this case all the policies constitute but one insurance, and as each insurer can be liable ultimately only for a proportion of the loss, a return of premium for short interest must be due from each. When it was determined to alter the English rule, by making the prior insurers liable in such case to the full amount of their policy, it was just and necessary to alter it also by authorizing them to retain their entire premium. We say then that if we are right in our construction of the clauses they cannot apply, for the facts do not exhibit a double insurance. There was interest to supply all the policies, and they all attached. There could be no return premium, for if the whole cargo had been lost before the arrival of the vessel at Callao, each company must have been paid the full amount of its insurance.

2. The assertion that the common law rule of rateable distribution is abolished in toto, and that the clauses under consideration have substituted a new rule of universal application, is effectually refuted by the usage that has obtained since the introduction of these clauses into the policy, and which it will not be denied may be properly invoked to aid their construction. 3 *Kent's Comm.* 229. If we rightly understand the views of the opening counsel, and we are certainly anxious to understand and truly represent them, he means to say that whenever there is a subsequent insurance on the same cargo and risks, the prior insurers are nevertheless answerable, (i. e. in every case of loss,) " to the full extent of the sum by them subscribed, without right to claim contribution from such subsequent assurers :" in other words, that the subsequent assurers are never liable until the first policy is exhausted ; they can never be made to contribute where it is sufficient to satisfy the loss. We conceive this to be the meaning of the counsel, because the words we have marked as quoted are those on which he seems to place the stress of his argument ; and because when first and separately considered, they certainly favor the interpretation that has been stated. On the other hand we insist that the clause refers only to a subsequent assurance, not merely on the same

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

goods, but the same interest, and that the obligation to contribute in such case is taken away, because the subsequent policy is prevented from attaching, the whole value being covered by the first ; but where there is a surplus interest to supply aliment, in whole or in part, to the subsequent policies, they must always contribute to every loss, total or partial, so long as the goods, or any portion of them on which they had once attached, remain at risk. Now what is the usage as certified by Mr. Hicks in his report, and admitted by the plaintiffs and their counsel ? It is that where there are two or more policies on the same cargo and risk of different dates, and interest to supply them all, if a loss either partial or total takes place whilst the goods are all on board, the several policies contribute to its payment in proportion to the sum insured by each ; and this usage it is expressly found, embraces time policies. It is needless to offer arguments to show that this usage is entirely inconsistent with that interpretation of the policy on which our adversaries insist. It shows conclusively that the English rule of rateable contribution is not abolished in all the cases to which it is applied, and that subsequent insurers may still be compelled to bear their proportion of the loss, even where a prior policy remains unsatisfied. The usage embraces all losses, *partial*, as well as *total*, and partial of any amount. Suppose a partial loss of less amount than the sum insured by the prior policy. Here then the subsequent insurers are " answerable for an amount which the prior insurance is not deficient towards fully covering," and here the prior insurers are not " answerable to the full extent of the sum by them subscribed, notwithstanding there are assurances subsequent in date." Why is this? But one answer can be given, because the terms of the policy, fairly interpreted, do not embrace a subsequent insurance of an interest not covered by the prior ; for in the very case supposed, if the second policy were on the same interest as the first, the *subsequent insurers* would not be liable. It is true there is no evidence as to the usage of settlement, where there are time policies on cargo and a portion of it is landed before the loss occurs, nor was it necessary there should be. The usage proved is sufficient to fix the interpretation of the policy. It is sufficient

to show that the prior and subsequent clauses do not apply when there is interest furnished to all the policies. The conclusion is necessary, that in every such case all losses subsequently accruing are to be borne rateably by the several policies, without reference to their respective dates.

Again, we have seen that the usage embraces all losses, total as well as partial; but according to the reasoning of our adversaries, the loss now claimed is neither. It is not total, because some of the goods had been landed—it is not partial, because all that remained on board were wholly lost. To prevent the present loss from being considered total, a total loss is first construed and rightly construed to mean a loss of the whole subject insured ; and that the present may not be regarded as partial, is next defined a loss of the whole interest at risk. The loss as now claimed it seems is *sui generis*, being a total loss of the goods on board. It is a loss therefore to which the usage, embracing only total and partial losses does not extend ; and it is the very case in which the subsequent insurers are discharged by the express terms of the policy. We refer the court to the language of the counsel, where he says, " that the subsequent insurer of an uncovered interest is expressly exonerated from all risk in case of total loss, as to an amount on board equal to the eldest policy." What the counsel means by saying that such an insurer is *expressly exonerated*, we find it difficult to understand. Certainly the policy contains no express mention of such a case ; and if such an insurer is exonerated at all, it can only be by virtue of the general terms of the clauses we are considering. These clauses make no distinction between partial and total losses, still less are they confined to losses of the peculiar and anomalous character to which the present is referred. Where they operate at all, they do so by exonerating the subsequent insurers from all losses whatever, partial or total, not exceeding the amount of the prior policy, and in the case of double insurances such is their necessary effect. Now a second policy which there is full interest to supply, is either a subsequent assurance within the meaning of the clauses, or it is not. If it is, then the insurers on such a policy are exonerated from every loss of the character mentioned. If it is not, they must contribute

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

rateably to all. The usage proves that the insurers are not so exonerated, and consequently that the policy is not such a subsequent assurance as the clauses alone contemplate. Again, the spirit and meaning of the usage plainly are, that the several policies once attaching contribute rateably to every partial loss; and if the loss now claimed is such, it is embraced by the usage. That such is its nature and character, we think it hardly possible to doubt. It was total it is true, in respect to the goods seized, but partial in respect to the subject insured in all the policies. If the $27,000 claimed had been wholly lost, whilst the other goods were on board, the loss would still have been total in the same sense which it now is, and yet in that case it is not denied that the several policies must have contributed to its satisfaction. Why so? Plainly because the goods were a part of the cargo on which the policies had all attached—a part of the subject insured in each; and how they cease to be so by the landing of the other goods, we own ourselves unable to comprehend.

The positions of the opening counsel rest entirely on the erroneous interpretation which he has given to the word "answerable" in both the prior and subsequent clauses. He says that where there is a prior policy, the second insurer "is only to be answerable (i. e. in case of a loss, for in no other event is he to be answerable at all) for so much (evidently meaning of such loss) as the amount of such prior assurance may be deficient towards fully covering the premises insured." We submit with confidence that such is not the true interpretation, but that the meaning is that where there exists a prior policy, the second insurers are not to be answerable *at all*; i. e. are not to incur a legal obligation, are not to be bound by their subscription, unless for "so much," not of a loss occurring, but of the sum subscribed, as the amount of the prior assurance may be deficient towards fully covering the premises insured; in other words, that the second policy shall attach only so far as may be necessary to protect the interest not covered by the first. The existence of a prior assurance is the sole event which is to exonerate the subsequent insurers, not the additional fact of the occurrence of a loss. And had the intention of the parties been such as is supposed, it would have been ex-

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

pressed, it seems to us, in very different terms; they would have said that where there shall be a prior insurance, and a loss shall happen, the second insurers shall only be answerable for so much thereof as the amount of such prior assurance shall be deficient towards fully satisfying, not "deficient towards fully covering" the premises insured; words which on the construction of our adversaries, would be worse than useless, since they make the second insurers liable, not for the excess of the loss over the amount of the prior assurance, but for so much of it as may be equivalent to the difference between the amount of the prior assurance and the whole value of the goods insured. So that if the value of the goods were $20,000, the amount of each policy $10,000, and one half of the cargo were to be lost, the second insurers would be answerable for the whole loss, since this would be "so much as the amount of the prior assurance would be deficient towards fully covering the premises insured." Again: It is only when a loss occurs, according to the learned counsel, that the clauses in question can have any effect at all; so that upon his construction, when the voyage is safely performed, none of the insurers would be bound to return their premiums, although the sums insured by the several policies might exceed by any amount the whole value of the goods insured. If the learned counsel intended to say that the second insurers are to be answerable in case of a loss for so much, not of the loss, but of the sum subscribed, as shall be equal to the deficiency between the amount of the prior policy and the value of the premises insured by the second, his position is doubtless relieved from some of its difficulties, but it ceases to be applicable to his case. What were the premises here insured by the second and third policies? Plainly all the goods on board at the commencement of the risk, on all of which these policies in proportion then attached. What was the difference between the amount of the prior assurance and the premises thus insured? Why more than the whole sum subscribed by the subsequent insurers, and it is a part only of that sum which is charged on their policies. To say that by premises insured is meant insured at the time of the loss, and that the premises here insured at the time of the loss by the subsequent policies

was only so much in value of the goods on board as remained after deducting the whole amount of the prior assurance, is first to give a very strained construction to the terms of the policy, and next to assume the very question in dispute, namely, that where several policies have attached, the relative liability of the insurers is altered by a diminution of the interest on *board during* the continuance of the risk.

Lastly. Our assertion that the clauses in question are confined to cases of double insurance, so that where they apply at all, their effect is to prevent the subsequent policies from attaching, in whole or in part, is fully supported by the authorities, including the very cases to which the learned counsel has referred. For the definition of a double insurance, we refer the court to *Parke, ch.* 15, *p.* 373, and we ask their particular attention to his observations in the same chapter, as to the contrariety of foreign regulations on the subject, page 381, as clearly showing that, by recurring to French authorities in this discussion, we are far more likely to be misled than enlightened. The earliest American case is that of *Thurston* v. *Kotch,* 4 *Dall.* 348, *App.* 32, before quoted. This was a plain case of *double insurance,* in which the prior insurer, who had paid the whole loss, was permitted *to recover a rateable* proportion of the subsequent insurer. The usage in Philadelphia it seems had been different, and it was in consequence of this decision, and for the purpose of altering the rule as here declared, (we have the authority of Mr. Condy for saying,) that the proviso as to prior and subsequent assurances was first introduced into American policies, which it is therefore unreasonable to suppose was meant to go further than to avoid the inconvenience of the decision, by restoring the usage which had before prevailed. 1 *Cond. Marsh.* 152, *n.* 13. *See also Peters* v. *Del. Ins. Co.,* 5 *Serg. & Rawle,* 475 ; *Phillips on Ins.* 326, *and cases there cited.* In this case the clause as used in the Philadelphia policies is given, which declares that the second policy, when there is no interest to supply it, shall be null and void. In *M'Kim* v. *The Phœnix Ins. Co.,* 2 *Wash. C. C. R.* 95, Judge Washington held that $12,000 of the sum claimed was covered by a prior policy, and consequently that the second as to that amount did not

attach, but was null and void. In *Murray* v. *Phil. Ins. Co.,* 2 *Wash. C. C. R.* 186, it was held that $4000 only of the $6000, at which the property insured was valued, was covered by the prior policy, and that the policy of the defendants attached on the difference, so as to render them liable in that proportion for a partial loss. In *Kenny* v. *Van Horne & Clarkson*, 1 *Johns. R.* 385, it was one of the questions whether there was a surplus of insurable interest to warrant the insurance by the defendants; the court held there was, and that the policy of the defendants therefore attached and rendered them liable. In *Kane* v. *Col. Ins. Co.,* 8 *Johns. R.* 176, the question was substantially the same—whether, deducting the amount of the prior insurance, there was any interest remaining to be covered by the second, the decision depending upon the mode in which the value of the whole interest was to be estimated. The court held that there was a surplus interest—therefore that the second policy attached. *Minturn* v. *Col. Ins. Co.,* 10 *Johns. R.* 82—same question and same decision. In *Seaman* v. *Loring,* 1 *Mass. R.* 143, "Judge Story instructed the jury, that if they were satisfied that the whole value of the property was covered by the prior insurances, then the policy never attached for want of a subject-matter upon which it could operate." It deserves to be remarked, that in this case the prior insurances had been cancelled before the loss occurred, and even before the second policy could have attached, so that the policy of the defendants was the only one by which the property was then covered; yet the judge held, and upon a motion for a new trial adhered to the opinion, that this circumstance made no difference, and that the defendants were exonerated, because when they signed their own policy, there were others in force—a decision directly at variance with the supposition of the learned counsel, that the period to which the clauses refer is not the commencement of the risk, but the happening of the loss. The last case we shall notice is that of *The Col. Ins. Co.* v. *Lynch,* 11 *Johns. R.* 233, to which we have before referred. In this case the counsel of both parties in terms, admit that it is to double insurances only that the clauses apply; and the court not only adopt this doctrine, but, as we understand their decision, carry it much further

than we are disposed to urge it, by holding that, to render an insurance double within the meaning of the policy, it is necessary that the two policies should embrace the same risks and no other, and should commence and terminate at the same period ; and from the marginal note of the reporter, he seems to have understood the decision in the same manner. It thus conclusively appears, from this brief review of the cases, that the language which they hold is uniform and in perfect accordance with that construction of the policy for which we contend—namely, that where the clauses take effect at all, they discharge the subsequent insurers from liability at the commencement of the common risk, by preventing their policy from then attaching ; and in not one of them is there a dictum, intimation or hint in favor of the novel doctrine of our adversaries, that where there are several insurances which have all attached, the prior policy may be charged exclusively with a loss on goods covered by them all.

Our last points are, that the plaintiffs are precluded by their own acts in exhibiting the statement of Mr. Hicks, as showing the extent of their claim, and consequently the limits of their abandonment, and by settling on the same basis with the other companies, from recovering in the present suit any greater loss than was there demanded ; and that at any rate the sums received from the other companies are to be taken into consideration in estimating the amount of the loss chargeable to the defendants.

*G. Griffin*, in reply. I shall endeavor to establish the following propositions : First, that even in the case of an ordinary voyage to a single port, where there are several open policies on cargo, executed on different days and containing the usual American clause relative to prior and subsequent insurances, and where a loss occurs during the continuance of the risk, and where the cargo on board at the time of the loss is insufficient in value to equal the amount of all the policies, the loss is to be borne by the policies respectively, according to the priority of their dates. Secondly, that at all events this rule is to prevail in a case like the one under consideration, *where the policies are on time for a trading voyage*, with a provi-

so in each policy for a return of premium for the time not used. And thirdly, that the original excess of interest beyond the aggregate amount of the policies, and for which the plaintiffs stood their own underwriters at the commencement of the voyage, does not, under the circumstances, go to diminish the defendants' liability.

1. As to the case of an ordinary voyage to a single port.

The defendants' counsel of course cannot deny the existence and application of our rule, where the insufficiency of the cargo to supply aliment for all the policies exists at the commencement of the risk ; but they deny the rule where the cargo was originally sufficient, but becomes afterwards insufficient in consequence of part being landed before the happening of a loss. We contend that it makes no difference whether the want of aliment to supply all the policies existed originally or occurred afterwards. Suppose, for instance, that a merchant ships at New-York goods of the value of $20,000 in a vessel bound to Liverpool, and effects insurance thereon by two policies of $10,000 each, bearing different dates, at and from hence to the foreign port ; that the day after the last policy is effected, he learns by advices from Liverpool that the price of the goods shipped had greatly fallen in that market ; that in consequence of such advice, and while the vessel lies wind-bound in this port, and without causing her any delay, he relands one half of the goods shipped ; that the vessel proceeds to sea with the other half of the goods, and meets with a disaster during the voyage, by which the goods on board are lost ; how is the loss to be recovered? It will be perceived that both policies attached ; for the insurance in each case was *at* and from, and therefore commenced from the loading the goods on board. We apprehend that, in the case supposed, the first policy must bear the whole loss ; that the aliment intended for the second policy being taken away, that policy ceased to exist ; and that the rights of the assured under the first policy are the same as though the goods intended to be covered by the second policy, instead of being relanded, had never been laden on board the vessel.

It is undeniable that the doctrine for which we contend would be sustained by the laws of France. The French rule is, that if there exist several contracts of insurance on the same interest and risk, and the first policy covers the whole value of the subject, it bears the whole loss, and the subsequent insurers are discharged. If the first policy does not cover the entire value, the subsequent policies, in case of loss, are bound only to make up the part uncovered ; and the French rule is the same, whether the insufficiency in value to meet all the policies was in the original shipment, or was superinduced by landing part of the cargo afterwards. The question, and the only question is, whether, *at the time of the loss*, there is sufficient aliment for all the policies. If not, then the first policy in order of time is to be exhausted before the other policies operate. That this is the rule of France, is fully established by the authorities cited by my learned friend who opened the argument on the part of the plaintiffs. Other French authorities might be added, but it would be a waste of time. Indeed I understand our learned opponents as virtually admitting the French law to be as we state it. The same rule exists in nearly all the commercial countries on the continent of Europe.

The ancient rule in England was in conformity to the French law. For this we have the authority of Chancellor Kent. 3 *Kent's Comm.* 281, 2d ed. But we have also an authority of greater antiquity. Malynes tells us that " when merchants cause a greater sum to be assured than the goods are worth or amount unto, when they are laden into any ship which is expected homeward, making account that their factors will send them greater returns than they do ; in this case the custom is, that those assurers that have *last* subscribed to the policy of assurance, bear not any adventure at all, and must make restitution of the premium by them received, abating one half in the hundred of their subscription ; and this is duly observed ; and so a law not observed is inferior to a custom well observed." Of this rule Malynes expresses great approbation, by calling it, in the language of the period when he wrote, " a *rare* custom of insurance." *Malynes' Lex. Mer.*

112. *See also Miller on Ins.* 266 ; *The African Company*
v. *Bull,* 1 *Show. Rep.* 132 ; *Gilb. Rep.* 232.

Thus stood the law of France and of nearly all continental Europe, and even of England itself, when Lord Mansfield ascended the court of king's bench. Under his auspices, the rule of Malynes was abolished, and a new rule substituted. This new rule was first judicially recognized in 1763, in *Newby* v. *Reed, Park on Ins.* 374. 1 *Cond. Marsh.* 147. The new rule of the English law breaks down all distinction between elder and junior policies. All the policies are considered as making but one insurance. If the subject at risk is unequal in value to all the policies, the assured may elect which set of underwriters he pleases for his paymasters ; and upon his recovery against them, they may, in their turn, call upon the underwriters on the other policies to contribute rateably towards their reimbursement. The grand feature of the new rule, therefore, is the supposed relation in which underwriters by different policies stand to each other as co-sureties, and their consequent liability to contribution to each other. The rule thus established by Lord Mansfield first came under judicial consideration in America in 1800, before the circuit court of the United States for the district of Pennsylvania, in the case of *Thurston* v. *Koch,* 4 *Dall.* 348, *App.* xxxii. The judges of the circuit court (Paterson and Peters) adopted the rule of Lord Mansfield. Judge Peters in his opinion (see Appendix) admits that the general maritime custom and law of Europe, and even the ancient law of England itself, were opposed to Lord Mansfield's rule ; but he nevertheless felt himself bound to adopt that rule, because it had been adopted by the British courts anterior to the revolution. Thus was the innovation of Lord Mansfield incorporated into the maritime law of the United States. But its reign here was of short duration. It appears that that the general usages of our country had been in conformity with the maritime law of Europe, and with the ancient rule of England. That such had been the usage in Philadelphia, is admitted in the opinion of Judge Peters. *See also* 1 *Cond. Marsh.* 152, *note* 13. That the introduction of the modern English rule was regarded as an innovation on the ancient usages of Boston, is

stated by the distinguished counsel for the defendants in *Seaman* v. *Loring*, 1 *Mason*, 146. The adoption of this rule in *Thurston* v. *Koch* seems indeed to have given very general dissatisfaction in our country. The commercial community of the United States were anxious to adhere to their former usages; and with a view to protect those usages from the operation of the new rule, our great trading cities appear almost immediately and simultaneously to have incorporated into their policies the clause that we now find in them relative to prior and subsequent insurances.

The clause in the policy under consideration is in the common printed form of American policies. It consists of two sentences—the first sentence regulating the effect of a prior insurance, and the second regulating the effect of a subsequent insurance. The case between us and the American Insurance Company is governed by the second sentence. In it the American Insurance Company contract, in case of loss, to be answerable to us *"for the full extent of the sum by them subscribed," "in the same manner as if no subsequent assurance had been made."* The sentence, in its very terms, excludes Lord Mansfield's doctrine of contribution between different sets of underwriters, declaring the defendant's liability for a full loss to the amount of their subscription, notwithstanding any subsequent assurance, *"without right to claim contribution from such subsequent assurers."* Now we submit that the case provided for in this contract has occurred. On the 17th May, 1824, the defendants underwrote for us twenty thousand dollars on the cargo of the China. A loss has confessedly occurred from one of the perils insured against, by which we are made losers to a greater amount than $20,000. We call on the defendants for payment. They say that nine days after the date of their policy, we effected a policy on the same cargo with the Atlantic Insurance Company; and that eleven days after the date of their policy, we effected yet another policy on the same cargo with the Niagara Insurance Company; and that therefore the American Insurance Company are not *"answerable for the full extent of the sum by them subscribed,"* but that the subsequent assurers are bound to come in and contribute rateably to the

loss. They invoke Lord Mansfield's doctrine of contribution between underwriters. We appeal to the express terms of the contract between us and them. They virtually admit that the letter of the contract is against them. The defendants' counsel say, " If the terms of the clause relative to subsequent assurances be separately considered, they undoubtedly seem to favor the interpretation of our learned adversaries, by making the prior insurer, in every case of loss, answerable for the whole amount of the policy, without any claim to contribution from the subsequent policy. If we recur again to the historical facts connected with the introduction of this clause into the American policies, we shall have still further reason to conclude that the parties intended by its introduction the very thing which the terms used by them so strongly imply. We have seen that the clause was introduced into the American policies just after the decision in *T urston* v. *Koch.* We have seen that the ancient English rule, in conformity with the general rule on the continent, excluded the doctrine of contribution among the different classes of underwriters, requiring that the first policy should be exhausted before subsequent policies should be called into operation. We have seen that the new rule of Lord Mansfield, confirmed in *Thurston* v. *Koch*, was contrary to the practice and hostile to the feelings of the mercantile community in the United States. And it was to secure the continuance of their own practice, and to repudiate the offensive doctrine of contribution between underwriters, and restore the ancient English rule, that the American clause relative to prior and subsequent insurances was introduced. To show that this was the true intent and object of the clause, we have not only historic, but also judicial evidence. The supreme court of errors of Connecticut, in speaking of this clause, say, " It was evidently the intention of the contracting parties in these policies, to avoid the inconvenience of contribution, by making the insurers liable in the order of time. This was anciently the law in England ; modern practice there had introduced a different rule. The parties intended, by inserting the clause in question, to abolish the modern and restore the ancient rule." *Brown* v. *Hartford Ins. Co.* 3 *Day's R.* 67. In *Peters* v. *Delaware Ins. Co.* 5

*Serg. & Rawle,* 481, Gibson, J. in commenting on this clause, says, " The clause on which this question depends, was, in consequence of the decision in *Thurston* v. *Koch,* introduced into the policy to prevent contribution between different underwriters, and to render them liable in succession according to the respective dates of their policies, instead of suffering the assured to exact indemnification from any one in particular whom he might please to select." In the same case, p. 485, Duncan, J. in speaking of this clause, says : " But the clause which gives rise to the present controversy was introduced to avoid the inconvenience of contributions, by making the insurers liable in the order of time, restoring the ancient law and custom of merchants."

Blackstone, in laying down the rules to be observed in the construction of statutes, says, " There are three points to be considered in the construction of all remedial statutes—the old law, the mischief and the remedy ; that is, how the common law stood at the making of the act, what the mischief was for which the common law did not provide, and what remedy the parliament hath provided to cure this mischief. And it is the business of the judges so to construe the act as to suppress the mischief and advance the remedy." " 1 *Black. Comm.* 87. *Introduction, sect.* 3. Now it is not a forced remark to say that the American clause relative to prior and subsequent policies may be considered as a private statute, enacted by the joint vote of the assured and the assurers, for the government of their contract ; and that it ought to be construed by the same benign rules applicable to the construction of legislative enactments. What then was the common law when this private statute was made ? and what was the mischief it was intended to remedy ? For when these points are ascertained, it is, in the language of Blackstone, " the business of the judges so to construe the act as to suppress the mischief and advance the remedy." The common law, at the date of the clause in question, was the rule brought into being by the creative mind of Lord Mansfield, and adopted by the American court in *Thurston* v. *Koch.* The mischief to be provided against was the supposed inconvenient doctrine of contribution between underwriters. The remedy provided

was the clause in question. Now to what extent and in what cases did the mischief exist when the clause was introduced? Our learned opponents say it existed only in the case of a lack of aliment in the original shipment to supply all the policies effected thereon. But out of their own mouths we condemn their definition of the limits and boundaries of the mischief. They themselves contend, and indeed it is their only point of defence in the case under argument, that the doctrine of contribution between underwriters (the mischief to be provided against by the clause,) extends, under the rule of Lord Mansfield, to cases where the lack of aliment to supply all the policies arises from a subsequent landing of a part of the cargo insured. If this doctrine of contribution does not apply to the case last mentioned, then the defence falls by its own weight. If the doctrine of contribution among underwriters would (but for the clause in question) apply to the last mentioned case, as well as to the case where there was an original lack of aliment to supply all the policies, then the mischief to be remedied existed in both cases. The mischief to be remedied was commensurate with the applicability of this doctrine of contribution. Under the rule of Lord Mansfield, this doctrine of contribution, from its very definition and nature, applied to every case where there was, at the time of loss, a lack of aliment for all the policies: whether such lack was coeval with the date of the policies, or arose subsequently; whether the insurance was originally double from the want of a full cargo, or was made double afterwards by landing, and thus subtracting from the risk a part of the cargo in the course of the voyage. In every case of deficiency of cargo to call for full payment on all the policies, the paying underwriter who had satisfied the claim of the assured had, upon the principle of Lord Mansfield, that all the policies formed but one insurance and all the underwriters were co-sureties, a right to call upon the non-paying underwriters for their rateable contribution.

The mischief, then, being applicable to every case of a want of full cargo for all the policies, whether original or supervenient, can it be doubted that it was the intention of the framers of the clause in question, to make the remedy com-

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

mensurate with the mischief? Could it have been their intention to cure the mischief when it arose from a transaction of one date, and leave it uncured when it arose from a transaction of another date? No; it was the intention of the framers of the clause in question, to apply it as an universal remedy against the supposed evil of contribution among underwriters, wherever and whencesoever it should arise. Such is the plain import of the terms used in the clause; and such is the inference to be deduced from the history of its introduction into our policies.

But our learned opponents have invoked to their aid the *usage* that has prevailed since the introduction of the clause in question. What that usage has been, is stated by Mr. Hicks, the referee, in his report to the court, founded on the written admissions before him by the counsel of the respective parties. The usage, therefore, is, for the purposes of this argument, a matter of record. One would have thought that this record proof as to the fact of the usage, might have superseded the introduction of any other evidence on that point; and yet our learned opponents have deemed it proper to appeal to Kent's Commentaries for proof of the usage. 3 *Kent's Comm.* 1st ed. 229; 2d ed. 282. It is probable Chancellor Kent did not mean to state the usage different from Mr. Hicks. Be that however as it may be, our learned opponents are precluded from attempting to contradict or vary the record by invoking his statement. They are thus precluded by the rule of estoppel, which emphatically applies to contradicting or varying a record made up on their own written admissions. They are also precluded by the decision of the supreme court of the United States in *Morris* v. *Harmer's heirs*, 7 *Peters*, 554, where it is held that the works of a living author cannot, in general, be admitted to prove facts, as the author himself might have been examined as a witness. Mr. Hicks reports, as to the usage, that there is no evidence of any usage in practice as to the mode of settling the loss on time policies on cargo, where there are several policies of different dates, and interest to supply them all at the commencement of the risk, and where a portion of the goods has been landed, and a loss of or on the residue then occurs, no such

case before that on which the present suit is brought having occurred. It then appears of record that there has been no usage in a case like the present, where there were several policies of different dates, and a cargo originally full, but afterwards reduced by landing a part, and the adventure has been closed by a loss of the residue. The usage reported is confined to cases where the cargo remains undiminished and full to the time of the loss. But it is not perceived how this usage can be successfully invoked to aid the argument of our learned opponents. The usage in such cases could not, consistently with the terms of the contract, have been otherwise than it has been. It has therefore given no new construction to the contract, but has followed its natural and plain import and meaning. Had the contract been called under judicial consideration before any usage began, it must have received the same construction that it now would. It cannot be doubted, it never could have been doubted, but that where there are several policies on the same cargo, and a full cargo for all the policies is originally laden on board the vessel, and *remains on board down to the time of the loss,* such loss is to be borne by all the policies; and that if there is an excess of cargo over all the policies, the owner stands his own underwriter for the portion uninsured, and must bear its rateable share of the loss. The usage reported goes no further than this; and to have shown this, it was not necessary to have resorted to usage. The contract in its terms imports as much. Upon cases where there is at first full aliment for all the policies, and where such aliment continues undiminished down to the time of the loss, the clause relative to prior and subsequent insurances has no bearing. In such cases the elder and junior policies do not jostle or interfere with the other. Each policy has its own aliment; or, in the language of the clause itself, each policy has its own " premises" whereon to rest and feed. In the case of the cargo of the China, which amounted when shipped to about $47,000, the policy of $20,000 effected with the American Insurance Company had its " premises," and the policy for $10,000 effected with the Atlantic Insurance Company its " premises," and

the policy for $15,000 effected with the Niagara Insurance Company its "premises," and there was still about $2000 uninsured on which the plaintiffs stood their own underwriters. While all this cargo remained on board, the elder and junior policies had as ample and independent scope for their respective operations, as though they had been effected on the cargoes of different vessels. And had there been a loss while all the cargo remained on board, the "premises" covered by all the policies would have suffered from it proportionably; and therefore each policy must have borne its rateable share, and the owners the rateable share on the uninsured cargo. But it would have had no resemblance to a case of co-sureties; each policy would have paid its own proper debt, and its own proper debt only. One underwriter could not have been said to have paid the debt of another underwriter, and therefore had no pretence of claim against such other underwriter for contribution. It will be readily perceived, then, that Lord Mansfield's doctrine of contribution has no application to this department of cases. It follows that the American clause relative to prior and subsequent insurances has no application to them, for it has been shown that the design, and the only design of that clause, was to abrogate Lord Mansfield's doctrine of contribution. The clause therefore has the same extent and limits, and no greater extent and limits, than the doctrine it was designed to explode. But from the moment that the China had discharged about half her cargo in good safety, the American clause relative to prior and subsequent insurances began its operation; for from that moment a loss would have fallen within the scope of Lord Mansfield's doctrine of contribution. If the subsequent loss of the remainder of the China's cargo, which in fact occurred in the bay of Callao, was to be settled in a modern English tribunal subject to the doctrine of Lord Mansfield, the rule would be to consider the three companies who underwrote on the cargo as co-sureties; to allow the plaintiffs to select which of the companies they pleased for their paymasters; and then to allow the paying company to have recourse to the other companies for a rateable contribution; but the case being in fact under litigation in an American instead of an English tribunal, the clause relative to pri-

or and subsequent insurances takes the place of the modern English doctrine, and neutralizes the subsequent polices until the first policy shall be fully exhausted. Our learned opponents contend that the American clause relative to prior and subsequent insurances " is confined to cases of double insurances, properly so called." But without pausing to examine the accuracy of this position, I will proceed for a moment to inquire what a double insurance is. A double insurance is when the different policies doubly cover the subject insured. But may not this arise from matter *ex post facto* as well as from matter existing at the date of the insurance? If a full cargo for a vessel is contemplated and insured by different policies, and the cargo in fact put on board is only half in value to that contemplated and insured, then even our learned opponents would admit it to be a case of double insurance. Why double? Because the policies are twice as large as the subject covered. But suppose a full cargo was originally laden and fully insured by different policies, and when the vessel had proceeded a little way on her voyage, she had discharged one half of her cargo, and then had gone on with the remainder. Would not the remaining cargo, but for the clause relative to prior and subsequent insurances, be thenceforth doubly insured? Would it not be in the predicament, but for the clause in question, of being covered by policies to twice the amount of the value? And is not that the predicament, whatever may be the date of its occurrence, which constitutes the essence of double insurance? The remaining cargo in the case put, being thus doubly insured, any subsequent loss thereon would, by the modern English law, be adjusted according to Lord Mansfield's doctrine of contribution. But here the American clause relative to prior and subsequent insurances steps in, and cures the evil of double insurance, and the consequent evil of contribution, by postponing the subsequent policies until the first policy is fully spent.

II. Having thus endeavored to show, that even in an ordinary voyage the plaintiffs would have been entitled to recover the full amount of the policy underwitten by the defendants, I shall now proceed to show that at all events they are entitled to such recovery in a case like the one under consideration, where

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

the policies are on time, for a trading voyage, with a proviso in each policy for a return of premium for the time not used.

The report of Mr. Hicks states that the policy underwritten by the defendants, and the policies underwritten by the Atlantic Insurance Company and the Niagara Insurance Company respectively, are all substantially alike, except as to their dates. All the policies are on *time*. Every policy on time is, unless specially restricted, in its very nature a trading policy. It enables the assured to go where he pleases, and load and discharge where he pleases, and do any other lawful act he pleases, within the time limited. But these policies do not leave this right to depend on implication. It is expressly given in the most ample terms. The policies are "upon any or all voyage or voyages, passage or passages, in ports, rivers, and at sea, during the time aforesaid, with liberty to touch and trade at any port or ports as frequently as the captain or agent may direct, upon all kinds of lawful goods and merchandises laden or to be laden on board the said good ship China." The time insured was eighteen months, and the premium $7\frac{1}{4}$ per cent. During this long period, and on this trading voyage, it must have been in the contemplation of all the parties that the vessel would sometimes have a full cargo on board, and at other times very little cargo on board. Was it in the contemplation of the parties that, during this long period, the assured should pay the premium on a full cargo at the rate of about one hundred and ninety dollars per month, when during much of the time the vessel might be nearly empty? This was an inquiry not likely to escape the attention of the parties; for it is justly considered that economy is the soul of commerce. It did not escape the attention of the parties; for we find in each of the policies this important provision: "to return a relative proportion of the premium for each month not commenced, no less being claimed." This provision made the risk divisible. In *Tyrie* v. *Fletcher, Cowp.* 666, the court held the risk to be for 12 months and indivisible. But Lord Mansfield says, the parties "might have insured from two months to two months, or any less or greater portion, if they had thought proper so to do; but the fact is, they have made no division of time at all." But in the case now under argu-

ment, the parties made the risk divisible. Whether the pol-icies were to be all used or not during the whole eighteen months, depended upon whether the assured would elect to furnish aliment for them all, during all the time. If there should be any month or months when there was no aliment for a particular policy or policies, that policy or those policies ceased to be used during that month or months. Suppose the China at the end of three months had discharged all her cargo with the exception of five hundred dollars, and had so continued without taking any new cargo on board during the residue of the time insured, will it be pretended that the three sets of underwriters would have been entitled to retain their whole premium—that the assured would have been subjected to the enormous premium of more than $2800, (recokoning it at $190 per month,) on the reduced sum of $500 for the remaining fifteen months? This will hardly be contended in the face of the express written stipulation in each of the policies, to return a relative proportion of the premium for each month not commenced, no loss being claimed. This is a most trying test for our learned opponents. The very corner stone of their whole argument is, that the three policies continued in force notwithstanding the vessel was emptied of half her cargo. Their theory, if good for any thing, must go further and say, that the three policies would have continued in force had the vessel been emptied of ninety-nine per cent. of her cargo; that they would all have have continued in force while any cargo remained on board. If that is indeed so, if the three policies would have remained in force to however low an ebb the cargo might have been reduced, it follows as a necessary result that the assured could in no case have claimed any return of premium on either of the policies, whilst a dollar's worth of cargo remained on board the vessel. For every binding policy has a right to hold fast its premium ; no return of premium can be claim-able on a policy remaining in force. Upon the theory of our learned opponents, then, the important clause in the policy, rendered emphatic by being written, to return a rel-ative proportion of the premium for each month not com-menced, must have remained a dead letter, as to all and each of the three policies, whilst a single box or bale of goods

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

ALBANY,
Dec. 1835.

Amercian Ins.
Company
v.
Griswold.

remained on board, and could have life and activity given to it only by literally emptying the vessel of all its cargo.

On the 6th day of October the China arrived at Callao ; and on the 3d day of November the loss occurred. In the intermediate time she had discharged and safely landed about half her cargo. From the time of this discharge of cargo, we apprehend that the Niagara policy, which is the youngest in date, ceased to be used ; and that under the stipulation in the policy, we were entitled to a return of premium from that company during the nonuser ; and also that we were entitled to a relative return of premium on the Atlantic policy, which is the next youngest in date, inasmuch as the word " *relative*" renders the sum as well as the time divisible. If this be so, it follows that at the time of the loss the American policy and a relative part of the Atlantic policy were the only insurances in force, and of course the only insurances to which we could have resorted for our indemnity. For it cannot be denied, that the nonuser, and consequent right to reclaim the premium, were to be applied to the policies in the inverse order of their dates, beginning at the youngest, and leaving the eldest to the last. It was with the assurers on the eldest policy that we contracted first. They had the prior right to retain their premium. We could not impair that right by any contracts between us and other underwriters. Notwithstanding all such contracts, they had a right, which we could not disturb or question, to the retain every cent of their premium so long as $20,000 worth of cargo remained on board the China.

It is satisfactory to find the principles for which we contend sustained by the authority of the supreme court of this state ; and also by the authority of the supreme court of the United States. *Davy* v. *Hallett,* 3 *Caines,* 16, was an action on a policy on freight. In that case our supreme court decided that so long as there is, at the time of the loss, freight at risk equal to the sum insured, the freight previously earned and received by the owner, was not to be taken into the account to diminish the liability of the underwriter. In the emphatic language of Kent, chief justice, who delivered the unanimous opinion of the court, "the policy was to be valid and operative as long as there was aliment to keep it alive."

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

So we say in the case now under argument, that the policy underwritten by the present defendants was valid and operative as long as there was aliment to keep it alive ; and that so long as there were, at the time of the loss, goods on board the China at risk equal to the sum insured by the defendants, the goods previously landed are not to be taken into the account to diminish their liabilty. It is true that in *Davy* v. *Hallett*, the subject of the insurance and of the suit was *freight ;* and here the subject of the insurance and of the suit is *cargo.* The name of the subject cannot, however, vary the principle ; that is one and identical in both cases. But the case from the French law, cited and approved by the learned chief justice in his opinion, is the present case in its very terms. 1000 livres was insured from America to Marseilles on a cargo worth 3000. On the way, at Cadiz, two thirds of the cargo was landed. The vessel went on the voyage with the other third, affording just aliment enough for the policy. The French underwriters contended, as the underwriters in this case do, that, by virtue of the landing, the policy was reduced two-thirds in value, and did not attach upon all the cargo left on board so as to authorize a full recovery. But the French authorities repudiated the defence, and held that as there was, at the time of the loss, aliment enough left on board to keep the policy alive, the policy was not affected by the previous landing of two-thirds of the cargo. And this principle of the French law, the principle on which the present suit rests, the principle which our learned opponents must overthrow or be themselves overthrown, was thus sanctioned and virtually introduced into the maritime jurisprudence of this state, near thirty years ago, under the auspices of Chief Justice Kent, and without a dissenting voice from his brethren on the bench !

Nor has the principle laid dormant since. It was reviewed, discussed and sanctioned by the supreme court of the United States, in the case of *The Columbian Insurance Company* v. *Catlett*, 12 *Wheat.* 383. The argument on the part of the underwriters was, that as part of the cargo was landed at St. Thomas, the amount risked by them was diminished by their proportion of the cargo so landed. In short, that the loss was to be computed with reference to the value of the whole cargo

on board when the risk first attached, and not with reference to the value on board at the time of the loss, though it exceeded the sum insured.   It will readily be perceived that the defence in the case cited was identical in principle with the defence now relied on; but the supreme court of the United States unanimously overruled that defence.   The court say: "We think the true intent and object of the policy was to cover an insurance of $10,000 during the whole voyage out and home, so long as the assured had that amount of property on board."   And again the court say: "The intermediate landing of a portion of the cargo, in the course of the voyage, was wholly immaterial in the understanding of the parties, so long as the value on board was sufficient to cover the insurance."   Alluding to the case of a subsequent insurance on the same subject and risk, the court say: "If the clause usual in policies in the eastern states, as to priority of insurance, had been incorporated, and there had been a subsequent insurance, this, as the prior policy, must have first attached to the extent of the sum insured during the whole voyage."   This case cannot be strengthened by comment.   It speaks for itself, in a language unequivocal and controlling.

III. Thirdly; the original excess of interest beyond the aggregate amount of the policies, and for which the plaintiffs stood their own underwriters at the commencement of the voyage, does not, under the circumstances, go to diminish the defendants' liability.   This point was ably presented by my learned friend, who opened the argument on the part of the plaintiffs.   It is fully sustained by the French authorities, and by the case of *Davy* v. *Hallett*, and the case of *The Columbian Insurance Company* v. *Catlett;* and no decision or dictum has been quoted to controvert it.   Indeed, our learned opponents seem to have abandoned the defence of this point, almost in express terms.   I shall therefore leave it upon the opening argument, and the authorities, without further comment.

There are two collateral objections which remain to be answered.

It is said that the plaintiffs are precluded from now claiming a full recovery, by reason of their having formerly presented to the defendants a statement in which they claimed

only the defendants' contributive share of the loss. If we are correct in our present view of the law, it follows that the plaintiffs presented that statement to the defendants under a mistaken view of the law. But does the mistake of a party as to his rights make or vary the law of the land ? Does his misconception of his rights add to or subtract from those rights ? Had the defendants admitted the correctness of the statement when it was presented, and paid under it, such adjustment, followed up by payment, might now indeed have been relied on by them as an accord and satisfaction. But I am yet to learn that an offer by a creditor to his debtor to accept from him 10 shillings in the pound, can, when once rejected by the debtor, be afterwards relied on to prevent a full recovery of the debt.

Again, it is said that the monies received by the plaintiffs from the Atlantic and Niagara Insurance Companies ought to enure to the benefit of the defendants. But when the plaintiffs abandoned to the defendants, on the 2d day of February, 1826, the rights of the parties became fixed. As those rights were then fixed, so they now remain. The rights between us and the defendants, as fixed by our abandonment, were not to be varied or affected by any monies that we might afterwards receive from strangers; and we have already shown that the Atlantic and Niagara Insurance Companies were, in this transaction, but strangers to the defendants. Those companies settled with us, not as agents or co-sureties of the defendants, but each company for itself on its own private and independent account. As between us and the defendants, the payment by the other companies is *res inter alios acta.* In *foro conscientiæ* those companies have not paid us even enough. At the time of the loss the vessel had reached its market ; and the market value of the cargo lost is stated to have been above $71,000. The face of the three policies then afforded us but little more than half of an indemnity. Had all the companies paid us 20 shillings in the pound, we should still have been actual losers by the loss to more than $36,000. Whether this consideration induced the payments by the Atlantic and Niagara Insurance Companies, would be a useless inquiry. It would be an inquiry with which the defendants have no con-

cern.  Those companies are competent to take care of them-
selves.  If they have paid us too much by mistake, they may
perhaps recover back the excess.  If they have paid volun-
tarily more than the law would have exacted, their liberali-
ty is no reason why the defendants should be unjust.  But
it is needless to enlarge on this point.  It was settled by this
court in *Lucas* v. *Jefferson Insurance Company*, 6 *Cowen*, 635.
With the authority from 6 *Cowen* before them, it was dis-
creet in our learned opponents to touch lightly on this point.

The following opinion was delivered by *Chief Justice*
SAVAGE:

One question arising upon and presented by the report of
Mr. Hicks is, whether the defendants are liable first for the
*whole amount of specie* put on board.  This is a question of
minor importance, and has not been much discussed by
counsel.  I apprehend there can be no difference in princi-
ple between specie and any other lawful goods.  The poli-
cies were all upon a trading voyage.  The underwriters are
answerable as well for the original cargo as for any other
cargo or part of a cargo, for which the original cargo or
part of it has been exchanged.  This is supposed to be per-
fectly well settled, and was so understood and recognized
by this court in *Coggeshall* v. *American Ins. Co.*, 3 *Wen-
dell*, 283, *and cases there cited*.  The specie received on
board at Callao is to be considered part of the cargo covered
by the policies, or some of them, and must be accounted for
in the same manner as any other goods.  No question,
therefore, can necessarily arise upon that part of the cargo,
as depending upon any principle different from the residue
of the cargo.

The question, and it seems to me the only question be-
tween these parties, is, whether the plaintiffs have a right to
recover the full sum named in the policy, without reference
to the part which was landed at Callao, as there was property
remaining on board when the loss happened, exceeding in
value the amount embraced in the policy.  The defendants
insist that the plaintiffs can recover only such portion of the
amount insured as the amount of the policy bears to the

amount of the whole cargo originally shipped at New-York. As there is a *written* contract between the parties, the question must be determined by the terms of that contract. By it the defendants have made insurance to the amount of $20,000. It is admitted that the loss exceeds that sum, and that it was occasioned by one of the perils insured against. The defendants have received the premium of $7\frac{1}{4}$ per cent. upon $20,000. Upon what rule of construction is it that they are not liable for the amount insured? It is said that they are entitled to contribution where there are other policies, and if none, then they are entitled to the like contribution from the owner, who is uninsured. This usage it is found in the case exists, when the loss either partial or total occurs, when the several policies are full, and before any part of the cargo has been landed. This policy contains a clause which it would seem was intended to exclude any such right to contribution; it is as follows: "and in case of any insurance "upon the said premises subsequent in date to this policy, "the said American Insurance Company of New-York shall "nevertheless be answerable for the full extent of the sum "by them subscribed hereto, without right to claim contri- "bution from such subsequent assurers, and shall according- "ly be entitled to retain the premium by them received, in "the same manner as if no such subsequent assurance had "been made." Even if such right of contribution existed, it would seem to be a proper claim to be enforced against the other companies who have made insurance upon the same cargo, except as to so much of the cargo as was uninsured, and for which the plaintiffs were their own insurers, or rather so much of the cargo as was at their own risk. The object of insurance is indemnity; the insurer agrees to run the risk of the cargo to the amount of $20,000. The insured pays the premium demanded upon that sum. The agreement then is, that if the assured loses the property insured to the amount of the insurance, the insurer shall pay it. Suppose the whole cargo is worth $40,000 and the insurance $20,000, and the plaintiff at the first port sells or withdraws $20,000, and in going to the next port the whole remaining cargo is lost, is the contract between the

parties changed? Because there was more at the risk of the owner, does that vary the responsibility of the insurer? His contract is full; the loss is precisely the amount against which he undertook to indemnify. Does the owner diminish his security by putting other goods on board? Is the insurer bound to return any part of the premium when the risk has been full? I understand the rule to be, that the premium is never returned, when the policy has once attached to the whole amount. 11 *Johns. R.* 239. The ground assumed by the plaintiffs is in accordance with the preceding suggestions, and they insist that they have a right to recover the full amount of the policy, there being property to that amount lost. The defendants insist that their insurance does not attach upon any particular part of the cargo, but upon the whole, and covers an undivided interest in the whole, equal to the amount of the policy; and upon this principle it is, as they contend, that the usage rests which is conceded to exist—that if a partial loss takes place before the cargo or any part of it is landed, such loss must be sustained proportionably by the whole cargo, or by all the policies, if the whole is covered. If in this case the whole cargo had been seized and thus lost, it is clear that all the policies must have paid the amount of their subscriptions, and the plaintiffs must have lost the amount which was not insured. It is contended to be according to the usage, that if a part of the cargo had been seized before any of it had been withdrawn by the owner and landed, then the loss must have been apportioned; and it is urged that, upon the same principle, the loss should be apportioned, having happened after part had been landed; that the policies all having attached, they all remain; and that when property is landed, it is withdrawn proportionably from all the policies, not from any one of them.

With respect to the clause respecting prior insurances, the defendants' answer is, that the clause was introduced to prevent contribution in cases of double insurance; that it was intended to have no other effect or application; and that it has never in practice, or by any judicial determination, received any other application. "A double insurance is when the insured makes two insurances on the same risk and the same

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

interest." 3 *Kent's Comm.* 280. 1 *Cond. Marsh.* 146. It is also defined to be, when the same man is to receive two sums instead of one, or the same sum twice over, for the same loss, by reason of his having made two insurance upon the same goods. When a man has made a double insurance, he may recover against which of the underwriters he pleases, but he can recover but once ; an insurance is merely a contract of indemnity in case of loss. *Parke on Ins.* 373, 4. When two policies cover the same risk and the same interests, they are considered as making but one insurance. 1 *Condy's Marsh.* 146. In such cases the insured cannot receive a double satisfaction ; he can have but one satisfaction ; and the different policies formerly were bound to contribute rateably towards the loss. Such was the law and such was the rule which was intended to be changed by the clause respecting prior policies, as is contended by the defendants' counsel. Several cases have been cited on both sides, which are supposed to have a bearing upon the question now before the court ; but it is conceded that this precise point has not been decided, or at least that it is not to be found decided in any adjudged case.

The decision, I apprehend, must rest upon the clause respecting prior assurances ; and that we may the better understand it, in connection with the definition of a double insurance, I will again recur to its terms. The whole policy is not set forth in the case, but it is stated to be upon all kinds of lawful goods and merchandizes laden or to be laden on board the good ship China, and the sum subscribed is $20,000. The proviso is, " Provided always, and it is hereby further agreed, that if the said assured shall have made any other assurance upon the premises aforesaid," &c. Then follows that part which is applicable to this case : " And in case of any assurance upon the said premises, subsequent in date to this policy," the defendants will be answerable without right of contribution. *What are we to understand by the premises ?* If by those terms we understand the whole cargo, which was worth $47,-000, then the three policies were technically perhaps upon the said premises ; but there was no double insurance, because the several policies attached upon separate and

distinct interests in the goods; in other words, if by *the prem-ises* we understand an undivided $20,000 worth of the whole $47,000, then the subsequent policies did not attach upon the said premises, because there was aliment enough for them all. In that view of it, is this a case which is at all affected by the proviso? Had the whole cargo been worth but $20,000, the defendants would have stood insurers for the whole, and then subsequent insurances would undoubtedly have been double insurances to their extent, and would be relieved from contribution, and obliged to return the premium except one half per cent. Suppose, again, that the whole cargo had been worth $20,000; suppose the policy of the Atlantic company for $10,000 had been prior in time to the defendant's policy, and a total loss; in that case there would be a double insurance as to $10,000, and, according to the clause relating to prior insurances, or, as it is sometimes called, the American clause, the oldest policy for $10,000 must pay its whole subscription, and the defendants would be obliged to pay the balance, and return the premium upon so much as they would be exonerated from.

The doctrine of contribution in cases of double insurance seems not to have been established in England until the year 1763. A different decision was made in the case of *The African Company* v. *Bull*, 1 *Shower*, 132, about 1691. That was rather a case of over insurance. To an action on a policy subscribed by a number of underwriters, the defendant pleaded that the goods were worth but £2240, and that twenty-three persons had subscribed £100 each, and that the defendant was the next subscriber; and that, by the custom among merchants, he was discharged, and offered to return the premium—issue was taken, and the custom was proved by all the exchange, and the defendant had judgment. In *Newby* v. *Reed*, before Lord Mansfield in 1763, it was ruled and agreed to be the course of practice in case of double insurance, that though the insured is not entitled to double satisfaction, yet he may sue which he pleases and recover the whole sum insured; and the defendants therein may recover a rateable proportion from the other insurers. 1 *Black*. 416. *Parke*, 374. A few years afterwards, came before the same

learned judge the cases of *Rogers* v. *Davis* and *Davis* v. *Gildart, Parke,* 374, 5, &c., in which the question was discussed. Lord Mansfield says : "The question seems to be whether the insured has not two securities for the loss that has happened. If so, can there be a doubt that he may bring his action against either ? It is like the case of two sureties, when, if all the money be recovered against one of them, he may recover a proportion from the other." In the subsequent case of *Godin* v. *The London Assurance Co.,* Lord Mansfield says, as between the insurer and insured, upon the foot of commutative justice merely, there is no color why the insurers should not pay the insured the whole ; for they have received a premium for the whole risk. If the insured is to receive but one satisfaction, natural justice says that the several insurers shall all of them contribute *pro rata* to satisfy that loss, against which they have all insured. 1 *Burr.* 492. The French rule is different. The ordinance of Lewis 14th declares, that if the sum insured by a single policy without fraud exceed the value of the goods, the policy shall be good to the extent of their true value; and in case of loss, every insurer shall contribute in proportion to his subscription, and return the premium upon the surplus. (This is conformable to the English rule in the case of *African Company* v. *Bull.*) The ordinance proceeds : If the insurance be by several policies, and the first amount to the value of the goods, it shall stand alone, and the underwriters upon the others shall be discharged and return the premium subject to the usual deduction. If the first policy be not sufficient to cover the full value, the second shall answer for the deficiency. If there be several dates to the several subscriptions in the same policy, each date makes a separate contract, and ascertains the order of the liability of each underwriter ; but if several policies have the same date, they make but one policy. 1 *Condy's Marsh.* 147, *n. citing Valin, Pothier, Cleirac, Emerigon, and Malynes.* The doctrine of Lord Mansfield was discussed and adopted in the case of *Thurston* v. *Koch,* 4 *Dall.* 348. In that case it appeared that W. J. Vredenburgh, a merchant of New-York, had procured double insurance in New-York and Philadelphia upon his goods and merchandizes, on board a certain vessel from a port

in the West Indies to New-York. The vessel was lost, and he recovered of the plaintiff and another insurer, who were the New-York insurers, the whole amount of his loss. The defendant Koch was one of the Philadelphia insurers, and the question was whether he was liable to make contribution. The judges, Paterson and Peters, went into a full discussion of the question, and agreed, both upon principle and authority, that contribution in such case was proper and should be made, and they gave judgment for the plaintiff. This case was decided in 1800, and is the earliest American case upon the subject. In consequence of the decision of this case, adopting the doctrine of Lord Mansfield, the clause relating to prior insuance was introduced into the policies at Philadelphia, and, as is understood, in all American policies. The practice in Philadelphia was, before the case of *Thurston* v. *Koch*, in accordance with this clause, and opposite to the doctrine of that case. 1 *Marshall*, 152, *a., n.* 13. *Phil. on Ins.* 326. 5 *Serg. & Rawle*, 481. The object was to prevent contribution between different underwriters, and to render them liable in succession, according to the dates of their respective policies.

The case of *Kenney* v. *Clarkson & Van Horne*, 1 *Johns. R.* 385, was upon a policy upon the vessel valued at $2000. It appeared that there was a prior insurance for $3000; the assured were permitted to prove that the vessel was of sufficient value to cover both policies. This point was not discussed; but as it appeared that the vessel was worth $7000, there was sufficient aliment for both policies; and whether it was considered a double insurance or not, the plaintiff was entitled to recover; and had the policies not contained the clause as to prior insurance, it was not a case of contribution. The case of *Murray & Mumford* v. *Insurance Company of Pennsylvania*, 1 *Marsh.* 152, *n.*, 1 *Hall's Law Journal*, 161, contained these facts: In October, 1803, the plaintiffs effected insurance in New-York, on the ship Hope from Gottenburgh to New-York, for $4000, valuing the ship at that sum. In December after, they effected insurance with the defendants for $4000, valuing the ship at $6000. The real value of the ship exceeded $6000. A partial loss took place. The New-York company paid an average calculated upon $4000, and the

question was whether the defendants were liable at all upon the second policy. Both policies contained the clause relative to prior policies. Mr. Justice Washington held the defendants liable for the difference between the valuation of the ship in the first and second policies, ($2000,) upon which sum the defendants were compelled to pay an average. He says the case seems almost too plain to warrant an argument. The parties had agreed that the subject insured was worth $6000, and the defendants insured $4000. It turns out that $4000 of that value had been previously insured in New-York. The defendants are therefore, as to so much, discharged from liability. But had the ship been worth $8000, they would have been liable for $4000; but the defendants cannot be called upon for more than $2000, as that is all left uncovered by the first policy. This was, as to the $2000, a case of double insurance, and of a partial loss; and in such a case both policies were required to contribute, notwithstanding the first policy was not exhausted. The inference from this would be, that the clause under consideration was applicable to a total loss only, and is in conformity with the usage stated in the case. On the argument of this case, the case of *M'Kim* v. *Phœnix Ins. Co., Condy's Marsh.* 152, *n.,* was cited. That was a case of two policies upon the same cargo of goods, on the same voyage. The first was for $12,000. The amount of the second is not stated, but it was upon 125,000 pounds coffee, valued at 22 cents, and deducting the prior insurance, would leave $15,000. Both policies contained the clause in question. A total loss having happened, the first policy paid without suit by compromise. The defendants refused, and a suit was brought. It was held that the first policy was liable to the full amount, and the second for the residue. I infer, from the report of the case in 1 *Marsh.* 152, 6, *n.* and 1 *Hall's Law Journal,* 166, that the second policy did not pay the whole amount insured by it; that therefore the clause in question was construed literally; that it was not a case for contribution. According to the argument of the defendants in this case, both policies should have paid rateable; and in that event the second should have paid more than the first, being

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

for a larger amount, but that was not the determination. The first was exhausted before the second was liable at all. These two cases, considered together, seem to establish the proposition that the clause in question is applicable to total losses only.

The same principle was adopted in the case of *Kane* v. *The Commercial Ins. Co. of New-York*, 8 *Johns. R.* 229. The action was brought upon the second policy, upon goat skins valued at 50 cents each, and the amount subscribed was $15,000. The policy contained the prior policy clause. The plaintiff had an insurable interest at invoice cost, &c. to the amount of $22,000. The vessel and cargo were captured and entirely lost to the plaintiffs. There had been a prior insurance to $22,000. The value of the goat skins at 50 cents was $23,983, making proper deductions. The question was, what amount the plaintiffs were entitled to recover. Thompson, justice, delivered the opinion of the court, and says: The policy in this case contains the usual clause respecting prior insurance ; and it appearing that $22,000 had been previously insured, this must first be deducted and the underwriters made responsible for the residue only. The prior insurance was by an open policy upon the cargo generally— the present valued. In order to give effect to both policies, the first ought to be considered as attaching, in the first instance, upon that part of the cargo not covered by the latter, in order to have aliment for the latter. This case decides, that where there are two policies upon the same cargo, and both are not full, the first must be exhausted before the second becomes liable. Here both had attached ; and if contribution were the rule in such cases, it should have been applied. The distinction between the two cases consists in this : that in the present case all the policies had once been full ; in the other not.

In *Brown* v. *Hartford Ins. Co.*, 3 *Day*, 67, the court say it was evidently the intention of the contracting parties in these policies to avoid the inconvenience of contribution, by making the insurers liable in the order of time. This was anciently the law in England ; modern practice there had introduced a different rule. The parties intended by inserting the clause in question, to abolish the modern and restore the ancient rule. In *Potter* v. *Marine Ins. Co.*, 2 *Mason*, 476, it was decided that

if two policies bear the same date, the actual time of execu-
tion may be shown; and if the policies contain the usual
prior policy clause, the policy first executed bears the whole
loss, if it covers the whole interest; and that when two poli-
cies are concurrently executed, the operation of the prior pol-
icy clause is excluded, and the assured may recover his whole
loss upon either policy, and the others are liable for contri-
bution. Mr. Justice Story says that, by the very terms of
the common clause, the underwriters on the second policy
are liable for so much interest only as is uncovered by any
prior policy. He recognizes and states the common law
rule to be, that if the assured has the same interest insured
by several policies, he may sue on which he pleases, and is
entitled to recover his whole loss upon either of the policies;
and all that remains is a mere right in the party sued to re-
cover contribution from the other underwriters. In this case
the loss was equal to the first policy and $12,000 on the se-
cond. The advantages of the prior policy clause are, as
Mr. Philips says, *Phil. on Ins.* 326, that the different under-
writers are not made sureties for each other, and the assu-
red is saved from paying more than one premium for the
same risk, upon the same insurable interest.

*The Columbian Ins. Co.* v. *Lynch*, 11 *Johns. R.* 233, was
an action on a promissory note given for a premium of in-
surance. The policy was for the sum of $20,000 on goods
on board the ship Ann, at and from Bayonne to the first port
she might make in the United States. There was a prior in-
surance in Philadelphia for the sum of $7000 on the same car-
go, from Bayonne to New-York. The invoice price of the
cargo was $9512. The vessel arrived in safety, but the cargo
was partially damaged, to the amount of $2000 and upwards.
The defendant claimed a proportionate part of this loss, to
which the plaintiffs objected, on the ground that the prior pol-
icy must bear that loss, and that they were liable no further
than their proportion of the invoice beyond the first policy.
The defendant insisted that he was entitled to return of pre-
mium upon the amount of the prior policy, $7000, allowing
the plaintiffs a reasonable compensation for the risk at Bay-
onne. The plaintiffs had a verdict, and it was agreed that if
the court should be of opinion that the defendant was entitled

to any return of premium, the amount was to be deducted from the verdict. The policy contained the clause providing that the plaintiffs should be liable only for so much as was uncovered by any prior policy, and should return the premium upon so much of the sum insured by them as they were exonerated from by such prior policy. The court held that the plaintiffs having been solely responsible for the cargo while at Bayonne, they were under no obligation to return any part of the premium. The risk to the port of destination might have been different. The plaintiffs' policy was to any port in the United States; the prior policy was confined to New-York. The court said the risk was not divisible, and having been run, there could be no return of premium. Mr. Justice Yates says, it must be admittted that the greatest part of the risk contained in the policy of the plaintiffs, according to the manner this voyage has been performed, is comprehended in the Philadelphia policy, and being prior in date, they were exclusively liable for that part assured by them, showing that the prior policy might be exclusively liable for a loss, and yet the subsequent policy not obliged to return the premium. In *Seamans* v. *Loring*, 1 *Mason*, 146, Mr. Justice Story says, an insurance, prior in date, is to exonerate the underwriter, and entitle the assured to a return of premium; an insurance subsequent in date is to have no effect at all upon the present policy.

*The Columbian Insurance Co.* v. *Catlett*, 12 *Wheat.* 383, contains some principles which are applicable to this case. That case was upon a policy to the amount of $10,000 upon a cargo of flour, worth upwards of $16,000. The voyage was to St. Thomas and two other ports in the West Indies, and back to the port of discharge in the United States. This was held to be an insurance upon every successive cargo which might be taken on board at the ports where the vessel had liberty to touch. It was also held that such a policy covers an insurance of $10,000 during the whole voyage, out and home, so long as the assured has that amount of property on board, without regard to the fact of a portion of the original cargo having been safely landed at an intermediate port before the loss. On behalf of the company, it was argued that the loss was to be borne by them, with reference

to the whole cargo on board, *when the risk first attached*, and not with reference to the value on board *at the time of the loss*, notwithstanding it exceeded the amount insured. Mr. Justice Story says, p. 394, 395, "We are of a different opinion. We think the true intent and object of the policy was to cover an insurance of $10,000 during the whole voyage out and home, so long as the assured had that amount of property on board. The contemplation of the parties manifestly is, that the premium should be paid during the round voyage, upon the full sum insured, and that the assured should have the full benefit of the insurance, so long as he had $10,000 on board. The intermediate landing of a portion of the cargo in the course of the voyage, was wholly immaterial in the understanding of the parties, so long as the value on board was sufficient to cover the insurance. If the clause, usual in policies in the eastern states, as to priority of insurance, had been here incorporated, and there had been a subsequent insurance, this, as the prior policy, must have first attached to the extent of the sum insured during the whole voyage ; if there had been a subsequent insurance without any such clause, it might form a case for contribution among the various underwriters, but should in no shape affect the rights of the assured."

In *Davy* v. *Hallett*, 3 *Caines*, 21, 22, where the insurance was upon freight, Kent, Ch. J. says the policy was to be valid and operative, as long as there was aliment to keep it alive. The insurance in that case was upon so much freight in that voyage as would amount to $2000. A case is there cited from 2 *Emer*. 39, 40, in which insurance was made to the amount of 1000 livres upon goods on board a vessel from America to Marseilles. The vessel sailed with a cargo to the amount of 3000 livres, and discharged two-thirds thereof at Cadiz, leaving goods on board for the remainder of the voyage to the amount of the insurance. It was said by the French writers, Valin, Emerigon and Pothier, that the policy was not thereby reduced two-thirds in value, but operated still upon all the cargo on board to the amount of the 1000 livres.

I have thus examined several cases, which have been cited with a view to aid us in giving a construction to the clause in the policy upon which this case depends, and it will be seen

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

that the courts uniformly have understood the object of the prior policy clause to be to restore the rights of parties to what they were before Lord Mansfield introduced the doctrine of contribution. Previous to that time, the law was in England as it now is, and then was in all the commercial states of Europe : that where there are several policies, of different dates, upon the same subject, the oldest policy must be first responsible to the amount insured ; and of course is entitled, in case of over insurance, to retain the premium. It is supposed, however, that the usage agreed upon in the case, is at variance with this principle, and that the usage must prevail. I do not concede that any usage whatever can control parties in the making their contracts. Certain it is that contracts may be so framed as to control usage, as between the parties to the contract. Parties may make the laws for their own contracts, if they are not inconsistent with the laws of the land. The usage is, that where there are several policies upon the same cargo, and interest to supply them all, if a loss happens, either partial or total, the several policies contribute. This usage exists in regard to policies on time, and if the owner is uninsured for part, he contributes for such part. In so far as a total loss occurs under such circumstances, it is perhaps inaccurate to say that the policies contribute ; they in fact pay the whole amount insured by them ; for the usage, as stated, supposes the policies all full, that is, interest to supply them all. But the usage is the same when the loss is only partial. If the term *partial* be understood in an enlarged sense, as contra-distinguished from *total*, then a partial loss may be a general average. " Expenses incurred, sacrifices made, or damage sustained, for the common benefit of ship, freight and cargo, constitute general or gross average." 1 *Phil. on Ins.* 230. If it becomes necessary for the general good to throw overboard any part of the cargo, that loss, being for the general benefit, should be borne by all proportionably. This rests upon principles of justice, but I apprehend has no influence in deciding the rights of parties when a total loss takes place. By a partial loss a damage is done to the subject ; by a total loss the whole subject is destroyed, as to the plaintiff, and he recovers a compensation for it to the extent of the insurance.

It cannot be expected that I should pursue the elaborate and able arguments of counsel, which have been presented to the court; but there are some points which should receive a more particular answer than is contained in the preceding remarks. It is said that where a part of the cargo was landed the underwriter was relieved, and *Phil. on Ins.* 329, is cited to sustain the proposition, that if a part of the goods insured are withdrawn, and the risk upon such part has terminated, the interest is proportionably diminished. This is no doubt true, if rightly understood. If the goods on board are worth $20,000, and the policy covers the same amount, and then any portion of such goods are withdrawn, then, of course, the underwriter is relieved, because he is answerable for the actual loss only. We have a right so to understand this writer, for in that sense the remark is correct, but in any other it seems to me it cannot be. The insurance is upon goods laden or to be laden. Suppose no goods are in fact laden when the policy is subscribed, when goods to the amount of the policy are laden, then the policy is full. If they are then lost, the insurer is liable; and if no other goods are laden on board during the continuance of the risk, the insurer is liable for all loses, partial as well as total. Suppose then that double the amount is laden, then the policy attaches upon half; and when one-half is afterwards withdrawn, there is still aliment for the policy; is there any reason why he should not be responsible in the case of loss? Such is the letter of his contract, such is its spirit, and he has received a full consideration for the *whole* risk, not *half*. The insurer is not injured by other goods being put on board; on the contrary, he is benefitted; for in case of a partial loss, as above defined, all the property on board must bear a proportion of such loss, because, in the case of jettisons particularly, all the property is supposed to be benefitted by such loss; not benefitted positively, but saved from greater loss. This is the principle of *general average*, and this principle would apply between several owners, when there was no insurance. An insurer, for the purpose of the risk, becomes the owner to the amount of his insurance: he does not, however, become the partner with the owner of the residue of the cargo. There is no reason arising out of his rela-

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

tion as such qualified owner, why his risk should be diminish-ed by the landing of all the cargo, except the amount insured by him ; nor do I see any reason why a partial loss should be defrayed by contribution, other than the one already men-tioned. The usage mentioned in the case, I apprehend, proves nothing as to the question before the court. If the term *partial loss* be understood in a technical sense, it is a loss borne wholly by the party upon whose property it takes place ; and is then a particular average in distinction from a general average. *Phil. on Ins.* 369. Mr. Stevens says, *Essay on Average*, 140, " A partial loss, properly so called, is a total loss of a part of the interest ; ex. gr. in an insurance on twenty hogsheads of sugar, if one be *washed out*, that is call-ed a partial loss." In relation to partial loss thus understood, it must be conceded that the right to contribution must rest upon the usage alone, and not upon any analogy arising out of the principles of insurance. The case of *The Columbian Ins. Co.* v. *Catlett* was decided upon the principles above stated. The whole cargo was worth $16,000. The Co-lumbian Insurance Company owned $10,000 and Catlett owned $6000, I mean for the purpose of the risk. Upwards of $3500 worth of the cargo was sold at St. Thomas, and of course withdrawn ; but that did not diminish the risk of the underwriters. They were compelled to pay the whole $10,-000, deducting the premium note and their proportion of sal-vage which had been received by the owner ; so that the amount of the liability of the company was the whole amount of their insurance. The only difference in principle be-tween *that case and this, consists in the fact that there was but one insurance, here there are three.* In that case it was said by Mr. Justice Story, that if the clause as to pri-ority of insurance had been there incorporated, and there had been a subsequent insurance, this, as the prior policy, must have attached to the extent of the sum insured during the whole voyage. If the judge was right in that opinion, he has decided this case in favor of the plaintiffs. Again upon the principle of double insurance, this case is with the plaintiffs ; when the amount of the cargo was reduced to $27,000, the three policies covered the same amount of inter-ests to their extent. If there had been no clause of prior in-

surances, it would have been a case for contribution upon the principle of Lord Mansfield, adopted in the case of *Thurston* v. *Koch;* but the clause being contained in the policy, the first policy must pay to the amount insured by it, and the balance by the second. Even if the defendants were entitled to contribution, that would be no defence against these plaintiffs.

It was the doctrine of Lord Mansfield that the insured might prosecute which of the underwriters he pleased, and recover from him the whole loss, if his policy was of sufficient amount, and the defendant in that suit could call upon the other insurers to contribute their proportion. Peters, J. informs us, 4 *Dall. App*, 32, that before the decision of *Thurston* v. *Koch*, the custom in Philadelphia had long been to settle losses, when there were double insurances, according to priority of policy in date, without regard to the time of signature ; that is, not to call on the second set of underwriters, if those on the first policy were competent, or had paid the amount of subscription or loss. In that event, those on the second policy returned the premium, retaining one-half of one per cent. This practice was changed by that decision ; and to restore the ancient practice, no doubt, was the principal if not the only object of introducing the clause relating to prior insurance. It is well settled, however, that a policy of insurance is to be construed by its terms, in the same manner as any other written instrument ; and if the fair and evident meaning of the language used be to extend to all cases of prior and subsequent insurances, I know not what power the court has to limit the operation of the contract to double insurances only. It is the duty of the court to ascertain what was the intention of the parties, and that intention must be ascertained by the plain import of the language used by the contracting parties, and by nothing else, unless there is some obscurity or ambiguity which requires explanation. There is nothing in the clause itself which confines it to cases of double insurance. It is, " And in case of any in- " surance upon the said premises, subsequent in date to this " policy, the said American Insurance Company of New-York " shall nevertheless be answerable for the full extent of the " sum by them subscribed hereto, without right to claim

" contribution from such subsequent assurers, and shall ac-
" cordingly be entitled to retain the premium by them receiv-
" ed in the same manner as if no such subsequent assurance
" had been made."

From the agreement to return the premium in certain cases,
an argument is drawn in favor of the defendants' construction.
The previous part of the clause contains this provision : "And
" the said American Insurance Company of New-York shall
" return the premium upon so much of the sum by them assur-
" ed, as they shall be, by such prior assurance, exonerated
" from." This, it is said, can only be applicable to a case of
double insurance, when by reason of a prior insurance the pol-
icy never attaches ; because if the risk has once attached, the
premium is never returned. The answer to this argument, is
that the *clause in question was introduced to abolish the doc-
trine of contribution.* Now contribution is as inconvenient in
a case like the present as in one confessedly of double insur-
ance, and the equity in both is the same. If the clause in
question intended to abolish contribution in cases of double
insurances, how can we say that it was not also intended to
abolish it in all cases depending upon the same principle ? It
is then no objection to this construction, that the provision as
to return of premium does not apply to all cases to which
the other part of the clause does apply. On the other hand,
the policy contains a clause relative to return of premium,
from which the plaintiff's counsel have drawn an argument
in favor of their construction. The policy is for 18 months,
and being upon a trading voyage, when the policies might be
sometimes full and sometimes not, the insurers agreed " to
return a relative proportion of the premium for each month
not commenced, no loss being claimed." It was optional,
therefore, with the insured to furnish aliment for the policies
during the time. The plaintiffs were therefore at liberty to
withdraw their cargo or a part of it, and it is asked if all the
cargo but a few hundred dollars had been withdrawn in three
or six months, would the plaintiff be compelled to pay a pre-
mium upon all the policies ? And if the doctrine of the de-
fendants be correct, that a part of the cargo withdrawn re-
lieves the insurers rateably, it would seem to follow that they
all remain, so long as any goods remain on board. If it be

said that no premium is to be paid for the time, except upon the goods actually on board, still the construction leaves the plaintiffs liable to pay a triple premium upon such goods. This then makes a case of triple instead of double insurance, and by the clause in question no premium is to be paid, and no liability is to attach, except upon the eldest policy. It seems to me, therefore, that these parts of the policy would be inconsistent with each other, upon the construction given by the defendants.

Upon the whole, my conclusion is, that when part of the goods were landed at Callao the younger policy was relieved from liability, and that relief extended in the inverse order of the dates of the policies; that the defendants are liable for the full amount insured by them, and according to the agreement of the parties, judgment must be entered for $22,831 93, with interest from the 11th May, 1832.

Judgment was accordingly entered. Whereupon the American Insurance Company sued out a writ of error, removing the record into the court for the correction of errors, where the cause was argued by

*J. Duer & B. F. Butler,* (attorney general of the United States,) for the plaintiffs in error.

*H. R. Storrs & G. Griffin,* for the defendants in error.

After advisement, the following opinions were delivered in this court:

By the CHANCELLOR. Several minor questions are raised and have been discussed in this cause, which I shall in due time consider. The case also presents two questions of general importance to underwriters and to the commercial community, which I shall first examine. The first is as to the meaning and construction of what has been called the *American clause* in the policy. The second is as to the rule of contribution between the underwriter and the assured, upon a trading voyage on time merely, where a part of the cargo on which the policy originally attached has been landed and sold or exchanged, before the expiration of the time limited for the continuance of the

policy and the risk; or as between the underwriters in successive policies containing the American clause, where the cargo on board after the time limited for the commencement of the risk, has once been sufficient, to cover the whole amount underwritten by all the policies.

The American Insurance Company, by the decision of the supreme court, have been charged with their proportion of the general average loss sustained in this case, and with the $20,000 underwritten by them, as if the goods and specie on board at the time of the seizure had been the only cargo originally shipped at New-York. The counsel for the plaintiffs in error insist that this was not the correct and legal mode of estimating the loss, under the circumstances of this case; that the provision of the American clause making the first underwriters liable to the full extent of their policy, in the same manner as if no subsequent assurance had been made, does not apply to the case of a policy on time, upon a trading voyage, where the risk as to two or more policies has once attached by the lading of a sufficient cargo on board to fill all the policies; although by the landing or sale or exchange of a part of the cargo, during the time or voyage insured, the property at risk, at the time of the loss is so reduced in amount as to produce a double insurance upon what happens to be on board at that time. And even if there had been no subsequent insurances upon the same adventure, that the underwriters in this policy would only have been liable to contribution with the assured for the part of the original cargo which was seized in the proportion which the $20,000 underwritten by them bears to the invoice price of the whole cargo at New-York: that is, in the same manner as if the whole cargo as shipped at New-York had remained at risk at the time of the loss, and only a part thereof had been seized.

If the amount of insurable interest in the goods insured exceeds the sum which is underwritten in a single policy, the owner of the goods is considered as his own insurer for the excess; and upon the adjustment of a *partial loss*, the underwriter contributes only such a proportion of the whole amount of his subscription, as the loss sustained bears to the whole insurable interest in the goods at risk, estimating them at the

invoice price at their places of lading, including premiums and commissions. *Annesly*, 103. *Evans*, 40. *Parke*, 104. *Phillips*, 375. If the whole property covered by the insurance, and also that which is uninsured, is totally lost, it is perfectly evident that the underwriter must pay the whole amount of his subscription to the policy, and there is nothing to be apportioned between him and the assured, except their respective shares of general average, and the expenses incurred in endeavoring to save the property, and subsequently the salvage or proceeds of the *spes recuperandi*, if any thing should be afterwards recovered. This division of a partial loss between the underwriter and the assured, in cases of *short insurance*, is sometimes incorrectly called a particular average ; but it may more properly be denominated the apportionment of a partial or average loss between the successive insurers under the American clause, or between the underwriters and the assured where the latter was his own insurer as to a part of the subject of the loss. The usage which is found in this case, as to such apportionment, where all the original cargo is on board at the time of the loss, is directly in accordance with the settled rule of law on this subject as between the underwriter and the assured, in case of short insurance ; the second or subsequent insurers being substituted in the place of the owner as to so much of the cargo at risk, at the time of the loss, as is not covered by the first insurance. The rule of apportionment as between the underwriter and the assured, it seems, is the same where the insurance is upon a single voyage from one port to another, upon an entire cargo or lot of goods to be laden on board the vessel at the port of departure, and where a part of the goods have arrived at the port of discharge, and have been safely landed before the loss occurs. *Gardner* v. *Smith*, 1 *Johns. Cas.* 141. But I am not prepared to say that this rule of apportionment ought to apply, even in the case of a single voyage from port to port, where a part of the goods had been relanded at the port of departure, or lost in the course of the voyage, in consequence of a peril not insured against ; so that the goods on board at the time of the loss covered by the policy do not exceed the amount of the underwriter's subscription. It is admitted that in such a case the

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

assured is not entitled to a return of premium upon the goods relanded, or lost by a peril not insured against, if the risk of the underwriter has once attached; although the goods relanded, or lost by a peril not insured against, reduces the amount of property on board, below the sum underwritten in the policy. The right to a return of premium, however, does not appear to settle the question as to the underwriter's claim to an apportionment of a subsequent loss, which may happen to the goods remaining on board.

But whatever may be the rule of apportionment in the case of a short insurance upon an entire cargo, for a single voyage, from the port of lading to the port of discharge, I am satisfied it can have no application to a case like the present. Here is an insurance upon goods to be laden on board a vessel for a trading adventure for eighteen months, with liberty to the assured to extend it to two years, at the same rate of premium, without reference to any particular voyage, or any ports or places of lading or discharge, or any specific cargo upon which the risk was to attach for the whole eighteen months or two years. Both parties therefore understood and expected that the whole, or particular parts of the cargo, would be frequently changed in the course of the eighteen months, either by the voluntary acts of the assured or his agents, or by perils which were not insured against; and both must have intended that the risk, to the extent of the $20,000, should attach to any goods remaining on board from time to time, as often as such changes should occur, provided goods to that amount were on board at the time any loss should occur by the perils insured against. Even if the underwriters, at the time they subscribed the policy, had been informed that the vessel was to sail from New-York for South America and the Pacific ocean, they also undoubtedly knew that it was a very common occurrence for vessels engaged in trading voyages from this country to South America and the Pacific, to dispose of the whole or a part of their cargoes in one port, and to ship the whole or a part of the proceeds thereof in specie for another port, before completing the cargo for the homeward voyage; and that the new cargo thus collected in South America, or in the islands of the Pacific, was frequently carried to the East

indies or China, where it was disposed of in the same manner, and another cargo collected for the return voyage to Europe or to the United States. A policy of insurance upon such a trading voyage, or upon time merely, where the vessel is to sail upon such a voyage, is in the nature of a new insurance upon the new cargo, or the goods remaining at risk, every time the cargo is increased or diminished otherwise than by the perils insured against. But the total amount for which the underwriters are to be made liable during the whole time or voyage, except for general average or other expenses incurred for their benefit in preserving or attempting to recover the property insured, cannot exceed the amount of their subscription to the policy, upon which amount the premium of insurance is calculated. In such a case, therefore, if the policy was underwritten for $20,000, and one half of the first cargo was *lost* by the perils insured against, so that the underwriters had become liable to pay $10,000 on account of that loss, they would, upon the next change of the cargo, only be underwriters for the other half of their original subscription, and the shipper would be considered as his own insurer for the residue of such new cargo, for the purpose of apportioning a partial loss thereon between him and the underwriters. This is unquestionably the spirit of the decision of the supreme court of the United States, in the case of *The Columbian Ins. Co.* v. *Catlett*, 12 *Wheaton*, 383 ; and the opinion of Mr. Justice Story, by whom the reasons of the court for their decision in that case were given, is entitled to great weight upon questions of commercial law. The decision of the court of king's bench, in the case of *Crowley* v. *Cohen*, 3 *Barn. & Ald.* 478, is also in accordance with this construction of a policy on time, where, by the usages of trade or from the nature of the business in which the insured is engaged, the amount of the goods at risk, as well as the kinds and qualities thereof, must be frequently changed during the continuance of the risks assumed by the underwriters. In that case there was a policy underwritten by different insurers, to the amount of £12,000, on goods to be carried on board of thirty boats belonging to the assured, which were engaged in the transportation business on a canal, for the term of twelve calendar months. One of the

ALBANY,     boats, during the twelve months, was sunk in the canal by
Dec. 1835.  one of the perils insured against, having on board goods to
American Ins.  the amount of £1700 ; and it was held, that in apportion-
Company     ing the partial loss occasioned by this accidental sinking of
   v.
Griswold.   such boat between the several underwriters and the assured,
            the latter was entitled to recover such a proportion of the
            loss sustained, as the amount of the subscriptions of the un-
            derwriters bore to the whole amount or value of the goods
            which were afloat in all the boats at the time when the ac-
            cident happened.   The case appears to be rather imper-
            fectly stated in the report; but I infer, from the language
            of Lord Tenterden, that the policy must have been under-
            written, by different persons, to the whole amount of the
            £12,000 ; and that, in speaking of the proportion of the loss
            which the assured was entitled to recover, he had reference
            to the aggregate amount of his claims against all the under-
            writers, and not to the amount which the defendant in that
            cause was liable to pay, for he could not have intended to
            say, that if the whole value of the goods afloat at the time
            of the loss did not exceed £12,000, the assured would be
            entitled to recover the loss of $1700 of the defendant, who
            had only underwritten the policy for £1000.   *Emerigon,*
            in the section of his treatise on the law of insurance which
            is entitled " *Merchandise Chargee dans un lien d'echelle.*"
            *Tom.* 2, *ch.* 13, *sec.* 8, shows conclusively, by a reference to
            Cleriac, Valin, and Pothier, that, by the continental law of
            Europe, the same rule of apportionment prevails between
            the assured and the underwriter, where the cargo upon
            which the policy first attached, has been changed by the
            master of the vessel after the commencement of the risk,
            under the clause *de faire echelle ;* which clause in a policy
            gives to the adventure upon which the insurance is made
            the character of a trading voyage.   The risk assumed by
            the underwriter in such a policy, to the extent of his sub-
            scription, attaches upon the subrogated or substituted cargo
            as often as a change takes place ; and the apportionment
            of a subsequent loss is to be made in reference to the
            amount of the underwriters' subscription, and the uninsured
            interest, if any, in such substituted cargo.   *See also Weskett,*
            *tit. Touching, p.* 548.

In the case under consideration, the policy being upon a trading voyage on time merely, without reference to any particular voyage or specified ports of lading or delivery, there was nothing to prevent the assured from changing the whole or any particular part of the cargo, as often as they pleased, while their vessel was lying in the bay of Callao, in accordance with the general objects of a trading adventure; and although it might have been the intention of the master of the vessel, when he landed and sold a part of the original cargo at that place, to have disposed of the residue there also, he had a perfect right, so long as a part of the cargo remained on board, to change his intention and go on with that part of the cargo to some other port. Even after the original cargo had been landed and sold, if the master had learned that it would probably be for the benefit of his owners to re-purchase the same goods and take them on to some other port, the policy would have attached upon those goods as soon as they were re-shipped. The rights of the assured, or the liability of the underwriters, were therefore in no way affected by any unexecuted intention of the master of the vessel, to sell that part of the original cargo which was on board at the time of the seizure at Callao. The policy attached as a new risk, upon every change of the whole or any particular portion of the cargo on board, either in port or elsewhere. I therefore conclude that, as between the underwriters in the first policy and the assured, if that had been the only insurance, the loss which actually occurred by the seizure of the vessel and cargo by General Rodil must have been charged upon the American Insurance Company, in the proportion which their subscription bore to the value of the goods and specie on board at the time of the loss; estimating that part of the original cargo which remained on board at its invoice price at New-York, including premiums and commissions, if commissions had been paid; or if by custom, they are to be added to the invoice price, where the purchase of the goods has been made by the assured in person; and as there was a total loss of the cargo then on board, which exceeded the amount of the sub-

scription of these underwriters, they would be properly chargeable with the whole amount of their subscription.

Having arrived at the conclusion that the amount recovered against the plaintiffs in error, by the judgment of the supreme court, would have been properly chargeable upon them under this policy, if no subsequent insurance had been made, I shall proceed to consider the effect of the American clause upon the rights of the several underwriters and the assured in this case. By the continental law of Europe, and by the English law of insurance as it existed previous to the decision of Lord Mansfield in *Newby* v. *Reed*, 1 *W. Black. R.* 416, if there were several policies of different dates upon the same subject, and the amount of insurable interest was insufficient to cover the whole amount insured in both policies, so as to constitute a case of double insurance, the second policy only attached upon or covered so much of the insurable interest, as was not covered by the first policy ; and the second underwriter was only entitled to retain the premium *pro tanto,* where the commencement and termination of the risks and the perils insured against were the same. 3 *Kent's Comm.* 281. *Vanderlinden's Comm.* 655, *b.* 4, *ch.* 16, § 7. *Miller on Ins.* 266. By this ancient English rule and the continental law, the second underwriter was, as he always ought to be, merely substituted in the place of the assured, as to the uninsured interest of the latter which was not covered by the first policy ; so that the rule of apportionment between the first and second sets of insurers, where both policies when taken together were sufficient to cover the whole insurable interest, was precisely the same as it would have been between the underwriters in the first policy and the assured, if the second insurance had not been made. If the object of the American clause was to restore this ancient rule of apportionment between the underwriters in successive policies, as it originally existed in the mercantile law of England as well as the rest of Europe, it was hardly possible to do it in more appropriate and explicit language than is used in the last paragraph of this clause. That language is, that in case of an insurance subsequent in date to the first policy, the underwriters in the first policy " shall neverthelesss be answerable for the full extent of the

sum by them subscribed, *without right to claim contribution from such subsequent assurers,* and shall accordingly be entitled to retain the premium by them received, *in the same manner as if no such subsequent assurance had been made;*" that is, that they are to have no right to claim a contribution from the subsequent assurers, and are to be answerable to the assured in the same manner, as if the subsequent insurance had not been made, as well as to retain the premium in the same manner. It appears to be impossible, therefore, under this policy, that the circumstance of there being subsequent policies underwritten by others, could make any difference as to the apportionment of the loss as between the underwriter in the first policy and the assured, or those who represented the insurable interest in the goods on board at the time of the loss, not covered by that policy.

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

If either of the subsequent underwriters have paid to the assured, upon a compromise of the claims made upon them, more than they were legally bound to pay under their contracts, that is a matter with which the underwriters in the first policy have no concern ; since they are not bound to refund any thing to the subsequent underwriters, and never had any claim upon them for contribution. If the assured have received any thing under such a compromise which they cannot conscientiously retain, they should restore it to those from whom it has been received ; but the American Insurance Company or its stockholders have no equitable right to insist that it shall be allowed to them in discharge of their legal liability under the first policy. The *technical rule* of estimating the value of the goods insured, by the invoice price at the port of lading, leaves a very considerable portion of the actual loss in this case uncovered by any of the policies ; and if, upon the compromise with the Niagara company, it paid more than it was legally holden for, the assured have a stronger equity to retain it, than the underwriters in the two first policies have to. demand it of them under their policies, in which all claim for contribution as to the last insurer was expressly relinquished. Besides, as the Niagara Insurance Company were not legally liable for any part of the loss, the whole value of the cargo at the time of its seizure being cov-

ered by the two first policies, that company, under the stipulation to return a rateable proportion of the premium for each month not commenced, were bound to return about $700 for the premium upon the twelve months not commenced at the time of the loss. The reservation of the *spes recuperandi*, or hope of obtaining compensation from the Spanish government for the goods seized, upon the compromise with the second and third insurers, in no way affected the rights or interests of the American company. By the abandonment, which remains in full force, the underwriters upon the first policy will be entitled to their full share of any thing which may hereafter be obtained from that source, so far as the property at risk at the time of the loss was covered by that policy ; and the assured are, by the compromise with the Atlantic company, only entitled to the portion of the *spes recuperandi* which that company would have been entitled to if it had paid the whole amount of that part of the goods lost, which was not covered by the first policy ; and if the whole value of the goods at Callao is recovered under the Spanish treaty, the American company will be more than compensated for the loss which they are compelled to pay, including the ten years interest which has accrued since this litigation commenced.

The assured were not bound by the statement of O. H. Hicks, which was presented to the several underwriters among the preliminary proofs of loss and interest on the 13th February, 1826. The underwriters did not admit the correctness of the statement, and refused to pay the loss in conformity thereto. It would not, therefore, have been binding upon the assured, so as to prevent them from recovering what was actually due from the underwriters, upon the first and second policies, even if they had themselves assented to its correctness under a misapprehension as to their legal rights. But it appears the assured objected to the statement in their conversations with Hicks. It was nothing, therefore, but an offer to compromise with all the underwriters on the basis of that statement. It was not exhibited at that time as limiting the extent of the abandonment which had been made upon the second of the same month ; and it appears by the special verdict that due proof of the loss and of the interest of the as-

sured in the cargo, as required by the terms of the policy, was exhibited to the American company as early as December, 1825, six weeks before the abandonment was made.

Under the construction which I have found myself compelled to put upon this contract of insurance, as a time policy upon a trading voyage, and upon the American clause contained therein, the amount for which the defendants in the court below have been held liable by the decision of the supreme court is no more than they were legally bound to pay by their contract with the plaintiffs. The judgment of the court below is therefore not erroneous, and it should be affirmed.

By Senator TRACY. This case presents two important questions of marine insurance, both of which seem to be measurably unsettled; at least, no distinct and indisputable adjudication upon either of them, by a court of controlling authority, has been found. This fact, in connection with the probability that both must have been often practically resolved, is laid hold of by each party with about equal plausibility, as proof that the position for which he contends are so clear, that no one before the opposing party of the suit had presumed to bring them into controversy. But however satisfactory this course of reasoning may be to the parties respectively, it affords no aid to the court in the solution of the questions, except as it admonishes it of the propriety of greater diffidence and care in coming to its conclusions.

The question first discussed by the counsel, in the order of their argument, is, what rights and relations subsist between the insured and the insurers of a cargo for a trading voyage, where the policies are on time, and do not cover all the insurable interest of the insured in the cargo? The second question, and in its bearings on the present case the most important, is what rights and relations subsist between different insurers, under time policies on the same cargo for a trading voyage, where the policies are of different dates, but have all fully attached, and where part of the insured interest is withdrawn from the risk, and the residue, being less than the amount insured by all, is totally lost?

The first question presents itself wholly unembarrassed of what is termed the American clause; for it would occur in the same form, and have to be resolved by the same rules, whether this clause was or was not in the policy. I shall endeavor, therefore, to keep it out of sight in this part of the case; and that the examination may be more simple, shall treat the question as though there were but one policy, and that to the amount of the three which the case discloses. It would then be a policy of $45,000 for eighteen months from the 17th of May, 1824, upon all kinds of lawful goods and merchandizes laden or to be laden on board the good ship China, "upon any or all voyage or voyages, passage or passages, in ports, rivers, and at sea, during the time aforesaid, with liberty to touch and trade at any port or ports as frequently as the captain or agent may direct;" which policy attached to a cargo of the value at the commencement of the risk of $47,096, and the ship with this cargo proceeded in safety to Callao, in South America, where she arrived the 6th of October following the date of the policy, where, after, unlading and discharging a part of the cargo and receiving on board about $2000 in specie, the ship and residue of the cargo, amounting to about $27,000, were unlawfully seized, and became wholly lost to the owners. The question upon these facts is, whether the insurers are liable for the whole loss, or only for a portion of it, in the ratio which the amount they insured bore to the whole insurable interest on board at the commencement of the risk, say about forty-five forty-sevenths. For the insurers it is insisted that the owners had no power to separate the insured from the uninsured part of the cargo, and therefore have no right to say that the part landed was that uncovered by the policy, and which had been at their own risk; that it is a prominent feature in a marine policy, distinguishing it from a fire policy, that the insurers, in case of loss, are liable only in the proportion which the sum they insured bore to the whole insurable interest, and not on the principle of indemnifying the insured against all the loss he may suffer in the general subject to which the policy relates; that a marine insurance is upon a part of the *whole*, and not upon the whole of a *part*; and when the policy attaches, it is

in the ratio which the sum it insures bears to the whole insurable interest then at risk, which ratio thus established cannot afterwards increase or diminish, or in any way change, until the whole risk insured against, is terminated, though the amount of the risk may be continually diminishing, and the policy relieved *pro tanto* by discharge of parts of the cargo. The insured, on the other hand, contend that they are entitled to a full indemnity for their whole loss, not exceeding the amount covered by the policy, without regard to any further interest originally existing, and discharged from the ship ; that the insurance was on a given sum of interest in the cargo, and not on any specific part or proportion of it ; that the proportion which this sum of interest might bear to the whole interest of the cargo was accidental, and no way affected the contract of the policy, which bound the insurers always, in case of a total loss of the cargo on board, to indemnify them to the amount of the policy, without regard to any change made subsequently of the amount of the cargo ; that the risk of the insurer neither expands nor contracts with such a change, but remains fixed and unalterable so long as the whole value at risk equals the sum of the policy ; and that in this respect such a policy must be broadly distinguished from one on particular goods, which are described in it as the specific subject for the insurance.

On first impression, it seems very strange that in the multitude of suits which marine insurance has given birth to in the English and American courts, that there should be found no distinct adjudication upon this point ; but on reflection I am satisfied that a question of this character, between owners and underwriters, is likely to occur much more rarely than I had supposed. In a direct voyage it can scarcely happen that the insured could discharge his uninsured interest from the risk, except it was done under circumstances that would avoid the policy entirely, as for delay, deviation, &c. ; and when the ship reaches her port of delivery, the policy continuing in force until the cargo is landed, the owner of course would not, if he could, withdraw the portion of it first landed from the protection of the policy, until the whole is out of risk; and until he withdraws the part absolutely, so that the insurer is

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

wholly discharged from any risk on account of it, there is as much reason why the owner should contribute towards the loss of the part yet remaining in the ship, as that the insurer should contribute for the loss of the part landed. The consequence is, that the loss of either part would be a partial loss, the principle of settling which is indisputable, while the loss of both parts would of course be a total loss, admitting of no controversy. *Gardner* v. *Smith*, 1 *Johns. Cas.* 141, was an action on a policy of insurance on goods from New-York to Jamaica, and 24 hours after the goods were landed. After part had been landed more than 24 hours, all the goods were seized, both those ashore and those yet on board; it was held that 24 hours after the goods were landed meant 24 hours after *all* were landed, and that it was a total loss of *all* under the policy. Now if, instead of a seizure of all the goods, there had been a seizure of those only that were, or of those only that were not landed, it is plain, on the principle of this decision, that it would have been but a partial loss, and the interests in all the goods must have contributed rateably. I refer to this case only to illustrate the improbability that the question now under consideration should arise on policies for direct voyages. I think it was the difficulty of supposing a case of a single voyage, where the owner could withdraw his interest from the risk before the whole risk was terminated, except by some act which of itself would invalidate the policy, that produced the intimation of Mr. Justice Story in *The Columbian Ins. Co.* v. *Catlett*, that if the case should arise, it would be decided against the right of the owner to do so. The obscurity of this principle has been produced, I apprehend, from confounding or rather misapplying the term total loss. Of course, its true meaning is well understood to be the destruction or loss of the whole subject matter, to which the insurance applied, but the term is sometimes improperly used to denote the entire loss of the whole subject then exposed to the particular risk by which the loss occurred, though a part of the insurable interest, which had been removed from this particular risk, but not discharged from all risk, was preserved. As in the common case of insurance on goods from one port to another and until safely landed, where, after a part of the goods

are landed the residue on board are lost. This is frequently denominated a total loss, though it is really a partial loss, because the goods landed were not, until all the goods were landed, withdrawn from all the risks against which they were insured, although they were withdrawn from the particular risk by which the loss occurred, and therefore as the insurer would have to contribute in case of their loss, notwithstanding they were landed, it is only reasonable and just that the owner should contribute on account of those on board, the same as though the loss had occurred before any were landed.

But in this case the argument for the insurers is not put on the ground, that the goods discharged from the ship at Callao were still in any sense at their risk, but on a principle which if carried out would assert, that after the insurable interest had been diminished by withdrawing a part of the original cargo, by sale or otherwise, that a total loss could never occur : in other words, that the loss of less than the original whole, must be a partial and not a total loss, notwithstanding it was a loss of the entire subject then at risk. This argument in its effect establishes an indissoluble portnership between the insurers and the insured, in regard to the risks of the whole capital of the insured at the commencement of the voyage, which plainly would be inconsistent with equity and reason. No doubt insurers and owners are in some sort partners, in respect to losses that occur in the capital at risk ; but this partnership is confined to the capital while at risk only, and does not extend to it when withdrawn from the risk ; for the moment it is withdrawn, and is not exposed to any of the risks for which the insurer is liable, that moment the insurer ceases to have any relation with it. While the gross interest covered and uncovered by the insurance remain at a common risk, the relations of the owner and the insurer, so far and only so far as it may be affected by a loss, are in the nature of tenants in common ; but this tenancy does not extend to the dominion or ownership of the property, for that remains entirely in the insured. The property continues his as much as before the insurance, and he may make whatever disposition of it he pleases. It is erroneous therefore to say that the insurer is,

for all purposes, in the relation to the uninsured interest which the owner is in to that which is insured. Their relations are not reciprocal, and there is no reason why they should be. The insurer, for the premium, agrees absolutely to bear the risks upon a certain amount or value, which value he has no power to change by withdrawing a portion of the property constituting it; but the owner makes no contract with the insurer in regard to any surplus value he may have on board beyond the value insured. Although for such surplus value he is sometimes called his own insurer, it means no more than that he has no insurance upon that value; and it is not intended that the unqualified control over this surplus value should not be as much with the owner as it would be if he had it in any other situation. If he throw it overboard, or sell it, or give it away, or in any other manner dispose of it so as not to increase the risk on what remains under insurance, the insurer has no right to complain. The mere fact that the fund is diminished from which contribution towards a partial loss could be exacted, is no more cause for complaint than it would be, that the fund for contribution towards an average loss was diminished by some other owner withdrawing his goods on board from the common risk. The principle upon which both contributions are made, is that the liability to loss is in the ratio of the property at risk, and that this ratio is necessarily the same, whether the property exposed be more or less. Thus the chance of 5, 10, 15 or 20 per cent. loss, is no greater on five thousand than on fifty thousand dollars; and therefore for a general average every interest afloat, and for a particular average every article of the cargo not expressly excepted, and for a partial loss the whole subject on which the insurance is made, contribute to pay the loss, on the principle that each in proportion to its respective value has contributed to occasion it. If this were not so, and the risk on any particular interest was increased or diminished by the diminution or increase of other property, subject to the same hazard, it would be seen that parties to an insurance would regard this circumstance in their contracts, and the amount of the whole property which should be maintained at risk for the purpose of contributing to average or partial losses, would be the subject of express stipula-

tion; but such a stipulation I presume was never heard of. And whether the value insured is to constitute one-tenth or nine-tenths of the gross value of the subject to which the insurance applies, is not a matter of inquiry, and indeed not a matter of interest to the insurer ; for his hazard of a total or of a partial loss is the same, whatever may be the proportion between the amount he insures and the whole amount of the adventure. If this circumstance, therefore, is deemed unimportant and wholly disregarded when the contract is made and when the risk commences, there is no possible reason why it is not equally unimportant and should not be equally disregarded at every subsequent period of the risk, and before a loss has occurred.

The cases given by the French writers show the rule established in France in trading voyages, but they seem not to have discovered what I suppose to be the principle of the rule, and which makes it a rule of universal application. The case from 2 *Valin*, 87, and 2 *Emerigon*, 39, 40, cited by Chief Justice Kent, in *Davy* v. *Hallett*, 3 *Caines*, 21, was where insurance to the amount of 1000 livres was made upon goods on board a vessel from America to Marseilles. The vessel sailed with a cargo to the amount of 3000 livres, and discharged two-thirds thereof at Cadiz, leaving goods on board for the remainder of the voyage to the amount of the insurance. This of course could not have been a case of insurance on a direct voyage, else the policy would have been avoided for deviation. No doubt the policy contained, what the French policies commonly do, the clause "*de faire echelle*," which is equivalent to a license to touch and trade at intermediate ports ; for we find another case put by Emerigon, exactly similar in principle, where this clause is stated to have been in the policy. It is that of insurances upon goods on board a vessel from the French islands to Cadiz and Bordeaux. The vessel touched at St. Andero, and was afterwards captured just before reaching Bordeaux. The question was whether the insured, by discharging a part of the goods at St. Andero, leaving still sufficient on board to fill the policies, furnished any just excuse to the insurers for not paying the whole amount of their insurance. It was answered it did not, for in such a case it

was enough that the assured shows goods on board at the time of the loss equal to the sum insured ; that the clause *de faire echelle* confers the right of touching at any ports in the course of the voyage to discharge or to receive goods ; that the policies being on goods laden or to be laden in the ship, would attach to goods put on board after the risk had commenced ; and therefore as the owner could increase the cargo, it followed that he might also diminish it, provided the insurer's risk on the amount he insures is not thereby increased. Pothier agrees substantially with Valin and Emerigon as to the right of the insured to withdraw his uninsured interest from the common risk.   But he imagines a subtle distinction where the insured, when near the port of final destination, withdraws a part of the goods, for the sole purpose of avoiding the dangers of averages which he apprehends.   But Emerigon denies the distinction and says, " Supposing such a case should ever occur, I think it would be decided against the insurer.   It is free to the insured to place the uninsured part of his interest in a place of safety, and to leave the insured part only in the ship ; for he had recourse to an insurance to secure himself against maritime risk, and did not thereby contract with the insurer any partnership property so called.  In doing so he has only exercised a right which he had.  *Nullus videtur dolo facere, qui jure suo utitur.*"  Emerigon might have given to this hypothetical case of Pothier, another answer at least as conclusive, viz. that the risk of the insurer is not affected by the amount of value on board, whilst it is equal to what he insures ; for in case of total loss his liability is always the same, and the risk from a partial loss is always in the same ratio to the cargo, whether that be more or less ; in other words, if the insurer, when there is a great excess value on board, has a larger fund from which he may draw contribution to a loss upon his own peculiar interest, that interest is also liable for losses happening to the other interests to the same extent, so that one liability exactly compensates the other, and it is therefore practically indifferent to the insurer whether the insured withdraws his uninsured interest or keeps it exposed to the common risk. It is for this reason that I cannot doubt that the English and American rule on this point must be the same as the French ;

and without further speculating on the possibility of there happening a case like the one suggested by Justice Story, in 12 *Wheaton*, it seems beyond doubt to me, that in a case like the present, of a time policy on goods laden and to be laden in a trading voyage, where from its nature the policy cannot be invalidated by delay or deviation, and where the right is expressly given " to touch and trade at any port or ports as frequently as the captain or agent may direct," the owner may at any time withdraw from the risk any portion of the cargo, and replace it with any other lawful goods, and that the insurer becomes a stranger to any portion thus withdrawn, the moment it ceases to be at his risk, and has no better claim on it for contribution than if it had never been on board. I am also satisfied that on such trading voyage different from a single voyage, the risk is as divisible as the property, so that each portion of the cargo is withdrawn from it as soon as safely landed, though upon being re-shipped it would again come under the insurance the same as other goods that had not been before on board. On this point therefore, that the insurers are exclusively liable for the whole loss at Callao, I have no doubt.

The next and more perplexing inquiry is, what are the rights and relations of the different insurers between themselves in respect to the loss for which some or all of them are liable; and particularly, have they a common liability for the loss, or is it a successive liability in the order in which their respective policies bear date? This question has been most ingeniously and most confidently argued by the counsel of both parties, and in the admitted absence of any clear authorities to aid in resolving it, one should feel some diffidence of the correctness of the conclusions at which he arrives.

It is conceded that by the common law of England, which in this respect our constitution makes the common law of this state, all insurers against the same risks become partners, or rather co-sureties, notwithstanding their contracts are of different dates, and notwithstanding the insurance exceeds in amount the interest insured ; and that the last underwriter is as much bound to contribute to the loss, whether total or partial, as the first. This is the rule given by Lord Mansfield,

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

first in 1758, *Goden* v. *London Assurance Company*, 1 *Burr*. 492, and again in 1763, *Newby* v. *Reed*, and which has ever since been recognized. It is contended, however, that it was a new rule which Lord Mansfield established, and contrary to the former one. So far as the present authority of the rule is concerned, it would not be important to inquire whether Lord Mansfield made the rule or only announced it, or whether the rule which he gave was in accordance or contradiction to the rule in France and in other countries ; for it is conceded on all sides, that after the case of *Newby* v. *Reed*, the rule became a settled one, governing all cases that afterwards arose. But for more clearly comprehending the present question in dispute, it may be useful to inquire particularly what was ruled in *Newby* v. *Reed;* whether it was a new rule ; and how it would affect the present case, if the American clause did not exist.

The case of *Goden* v. *London Assurance Company*, as well as that of *Newby* v. *Reed*, was where the insured had paid for insurance on a greater amount than had ever been at risk ; all the insurers had received their premium and were entitled to retain it. In the first case the opinion expressed was, that " if the insured is to receive but one satisfaction, natural justice says that the several insurers shall all of them contribute to satisfy the loss against which all of them insured." In the other case " it was ruled by Lord Mansfield and agreed to be the course of practice, that upon a double insurance, though the insured is not entitled to two satisfactions, yet upon the first action he may recover the whole sum insured, and leave the defendant therein to recover a rateable satisfaction from the other insurers." That this was not a new rule appears from its being " agreed to be the course of practice ;" and indeed it is not easy to see what other legal rule there could be. So far as the insurance applied to the same interest, which it must necessarily in case of double insurance, the different insurers were in the condition of co-sureties, and the principles of law applicable to other co-sureties were properly applied to them. The only case to be found wearing a different aspect, is that of the *African Company* v. *Bull*, 1 *Show*. 132, where the real point decided is, that a plea which would have been bad on demur-

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

rer may be sufficient after verdict. If the case of *Newby* v. *Reed* had not occurred, and the custom pleaded in the *African Company* v. *Bull*, were allowed to prevail, it seems to me that the question between the different insurers in the present case would be just the same that it now is. The custom claimed was that a subscription to a policy after the whole interest was covered should not be deemed to attach, and the insurer should not retain his premium; but in the present case the whole interest was not covered by prior insurances, all the policies did attach, and all the insurers were entitled to retain the premium they had received. Again, the single principle settled in *Newby* v. *Reed* was, that the insured might recover of any of his insurers more than a rateable proportion of the loss, leaving him to seek contribution from the other insurers; but in this case the insured does not seek from one, what he admits the others are also liable to pay, but claims from him on the ground that the others are not liable to pay. If the French law be invoked, it does not, as I understand it, aid in resolving the present difficulty. The *Commercial Code of France*, b. 2, *tit.* 10, *art.* 359, corresponds substantially with the custom that was set up in 1 *Shower*, and it is as follows: " S'il existe plusieurs contrats d' assurance fait sans fraude sur le meme chargement, et que le premier contrat assure le entier valeur des effets charges, il subsistera seul; les assureurs qui ont signe les contrats subsequents sont liberes; ils ne recoivent que demi pour cent de la somme assuree, Si l'entier valeur des effets charges n'est pas assuree par le premier contrat, les assureurs qui ont les contrats subsequents repondent l'excedant en suivant l'odre de la date des contrats." This rule it is seen, is intended to prevent double insurance, that is, to secure the insured from paying two premiums for the same interest and the same risk. It provides therefore that the several policies shall attach in the order of their date until the whole interest is covered, and when it is covered that subsequent policies shall not attach at all; but it does not provide for a case where all the policies have fully attached, and the risk in respect to all equally commenced. The counsel assume that this rule is the same, whether the insufficiency of value was original so as to prevent the subsequent policies

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

from ever attaching, or was superinduced after they had attached, by withdrawing a part of the subject at risk ; and if at the time of the loss the value at risk was not equal to the value insured by all the policies, then the policies were to be exhausted successively in order of date ; a subsequent policy not contributing at all until all prior policies were exhausted. If the French rule is carried to this extent, I confess I have not found evidence of it, unless it be in the confidence with which it is asserted by the counsel ; certainly the article of the code does not warrant this conclusion, and no authority that has been referred to, explains the relations that subsist between different insurers, whose policies have equally attached to the same subject. The inference that prior and subsequent insurers remain in the same relation to each other that the owner is in as respects his uninsured interest, to his insurers, is not very plain ; and it is only by this inference that the French authorities showing the owner's right to withdraw his uninsured interest can be made to apply. The principle of the two cases is different, and in the absence of direct authorities, one can hardly believe that the rule is the same. There is no reason why the rule in France should differ from that in England, where I apprehend it has been settled always, that when different policies attach to the same interest, the risk must continue alike, and the subsequent insurer will be no more relieved by withdrawing a part of the subject from the risk, than the prior insurer. This principle is not contradicted at all by " the rare custom of merchants," stated in *Malynes Lex. Merc.* 112, and by *Miller on Ins.* 266, or by the case in 1 *Shower*. That custom is exactly like the French law, and is stated to be that " when a greater sum is assured than the goods are worth or amount unto when they are *laden into the ship*," then " those assurers that have last subscribed bear not *any adventure at all*, and must make restitution of the premium by them received," &c. In Holland, as we find quoted 1 *Beawes Lex Merc.* 486, the rule was positive that " the last underwriter shall participate as much as the first either in profit or loss ;" but whether this was confined to cases where the aliment was sufficient to supply all the subscriptions, or extended to all cases like the existing English law, does not appear ; nor is it im-

portant, for it is sufficient for my present view, if the English law has always been, that where a community of interest has been once established by the attaching of different policies to the same subject, that the same community of interest continues till the risk is terminated. The decision in *Newby* v. *Reed* was not necessary to establish this proposition, and indeed the point in the case is not that all the underwriters were liable to contribute rateably, but that particular underwriters were liable in the first instance beyond their rateable proportion, and the right of those who had paid, to recover back a rateable proportion from those who had not, was an undisputed and inevitable consequence not necessary to be stated, and which was only incidentally stated by the learned judge. The only possible light in which this decision can be viewed as innovating on the previous custom, is not because it made all insurers, whose policies had attached, rateably liable, but because it recognized the principle that a policy attached to a subject already fully covered, as effectually as if it were not covered; thus putting the last policy, both as respects the right to retain the premium, and the obligation to contribute to the loss, on the same footing as the first. This last proposition it was which alone came into consideration in the case of *Thurston* v. *Koch,* 4 *Dall.* 348. It was a case where a prior insurer, whose policy covered the interest at risk, had paid the whole loss and sued a subsequent insurer for his contributive share. It seems that the existing usage in Philadelphia was to regard the subsequent policy as never having attached; but the court decided that the usage could not prevail against the law, that all the policies equally attached, and therefore, in the language of Lord Mansfield, natural justice required that all the insurers shall contribute *pro rata* to satisfy the loss against which all of them insured. This decision we have the authority of Mr. Condy and of Gibson, J. 5 *Serg. & Rawle,* 475, for saying, occasioned the introduction of what is termed the American clause. The counsel in this case, and all writers who have referred to this subject, admit that the intention of introducing this clause into the policy was to restore the rule or usage which the decision in *Newby* v. *Reed* was supposed to have disturbed. This usage, like the French law, avoided

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

several inconveniences, which arose from applying to marine policies, common law rules of construction applicable to other contracts, and which inconveniences did arise, when Lord Mansfield, disregarding the custom of merchants, applied those rules strictly to contracts of insurance. These evils were, 1. The owner, though he could recover but one satisfaction for his loss, was exposed to pay and frequently had to pay for two or more insurances against it; 2. The insurer did not know for how much he insured, as his contract would be varied or cut down in amount by subsequent policies; and 3. The insurers were made sureties for each other, and liable to pay more than their proportion of the loss in the first instance, and then resort to strangers for their indemnity. The case of *Thurston* v. *Koch* exemplified these evils, flowing as they all did from double insurance; and when judges and commentators speak of the American clause as adopted to cure these evils, they mean no more, and when their language is strictly analyzed they say no more, than it was adopted to prevent double insurance. But simple and single as is the acknowledged purpose for which the clause was framed, there are ambiguities and obscurities in it, which justify saying of it what Sir James Mansfield said on a former occasion of a policy of insurance, " it is a very strange instrument, as we all know and feel." It is capable of being construed many ways plausibly, and yet perhaps not capable of being construed any way so as to escape plausible objections. No doubt, however, whichever way it is construed, it is made effectual to prevent double insurance in those cases constituting the great majority of marine risks, where the interest at the commencement of the risk necessarily continues the same till the whole risk is teminated; but whether it provides for a case of double insurance, occasioned by a diminution of the interest insured after the risk commenced, as happened in this case, and which is liable to happen in all trading voyages, is the point of dispute between the parties, and which can only be resolved by a careful regard to the clause, in connection with the circumstances that gave birth to it. In looking out of the clause and only at these circumstances, one could hardly doubt that it was not intended to guard against cases of supervenient double insurance where

all the policies had once been fully supplied, but only for such a case as *Thurston* v. *Koch,* where a subsequent policy made after the whole interest was fully insured, was allowed to come in and displace the prior policy for a part of the risk which it covered—and in looking at the clause in connection with the circumstances that occasioned it, there is, I think, no great difficulty in confining its meaning to this latter case alone. No doubt if some of its terms be separately regarded and literally construed, they favor an interpretation making the prior insurer answerable in every case of loss for the whole amount of his policy, without any claim for contribution from subsequent insurers; but independently of the consideration that this mode of construing a contract, by regarding its parts separately, is repugnant to reason, and to the rule of law which requires the parts to be construed together, it would, if adopted in this case, lead necessarily to a conclusion which all parties admit to be false.

The construction to be given to the first branch of the clause is not so much disputed in the present case, as that to be given to the second branch; but when the construction of this branch is fixed, it will afford, I think, a key for rightly construing the other branch. The words of it are, "if the said insured shall have made any other assurance upon the premises aforesaid, prior in date to this policy, then the said American Insurance Company of New-York, shall be answerable only for so much as the amount of such prior insurance may be deficient towards fully covering the premises hereby assured, and the American Insurance Company of New-York shall return the premium upon so much of the sum by them assured as they shall be by such prior assurance exonerated from." The term *premises,* occurring in this branch, it is admitted by both parties, and it is indeed beyond doubt, means the cargo belonging to the insured. The term *answerable* is more equivocal, but when construed with the concluding part of the sentence relative to the return of premium, admits, I think, but of one construction. The argument for the assured has the effect of construing this word to mean *pay in case of loss,* which would not only exonerate them from liability to contribute to any partial loss, less in amount than the sum

covered by the prior policies, but construed as it must be with the concluding sentence, it would compel them to return all the premium, except on the part which they had to pay for a loss. Of course it is not this which the parties mean by *answerable ;* but what they must mean is, that the insurer shall not assume the risk, except so far as it has not been assumed by the prior policy. If the interpretation I give to the term *answerable* need any confirmation other than that afforded by the whole context, it will be found by comparing the American clause with the article from the commercial code of France, to which I have already referred. The clause evidently was taken substantially and in some parts literally from this article, and it is, I apprehend, only by a mistranslation of the words "*repondent l'excedent,*" that the doubt has arisen as to the meaning of the clause. "*Repondent,*" though it may be translated *do answer,* should be translated *do assume* or become responsible for, and cannot properly be translated "shall be answerable for," so as in any sense to make the contract dependant on a future contingency, but only on an existing but unascertained fact.

The second branch of the clause is, "and in case of any insurance upon the said premises subsequent in date to this policy, the said American Insurance Company of New-York shall nevertheless be answerable for the full extent of the sum by them subscribed hereto, without right to claim contribution from such subsequent assurers, and shall accordingly be entitled to retain the premium by them received, in the same manner as if no such subsequent assurance had been made." The word *premises,* occurring in this branch of the clause, it is agreed by the counsel, means the interest covered by the policy, and giving to the word *answerable* the same meaning that it has in the first branch, and which is equally applicable to it in this, and then the plain purport of the provision is, that notwithstanding a subsequent insurance on the interest covered by this policy, the insurers shall assume the risk, or become security for the full extent of the sum by them subscribed, without right to claim contribution from subsequent insurers of the same interest, and without obligation to return any part of their premium, because of a subsequent in-

surance of. the same interest. By construing the clause in this manner, we make the two branches of it completely reciprocal, and place the policy in exactly the same relation to a subsequent policy which a prior policy bears to it—we protect the insured from paying two premiums on the same interest and the same risk, and protect the insurer in his legal right of retaining his premium, wherever he has been exposed to the risk he insured against. But by rejecting this construction, and giving, as is asked, an unqualified and literal force to the provision, that the assurer shall not claim contribution from subsequent insurers, it will reach cases of partial as well as total loss, and thus not only deny contribution where by universal law and usage it exists, but also involve the absurdity of supposing that the insured is more careful of the interest of subsequent insurers than of his own, by providing for them an exemption, which confessedly will not extend to his own uninsured interest on board. But if we confine this provision of claiming contribution to a case of double insurance as generally understood, that is to a case where the second policy is applied to an interest already covered to its full value by a prior policy, all the mischiefs of what is termed Lord Mansfield's rule are remedied, the general analogous principles relative to contributions to partial losses are preserved, and the concluding provision relative to retaining the whole premium is made intelligible and sensible. Without this construction, what is the meaning or utility of this last provision? Why was it inserted? What necessity was there of saying that the insurers shall retain their whole premium, when there was aliment enough to feed their policy, except it be that their right to the premium should not be affected by a subsequent insurance upon the same premises which their policy covered? It is plainly the provision reciprocal of that in the first branch, which is, that the insurers in case of a previous insurance upon the same premises, shall return the premium upon so much of the sum as they shall be by such prior assurance exonerated from. Now, from what part of the sum by them insured could they be exonerated? Certainly from no part except that already covered by a prior policy; and where there was a surplus interest beyond that cov-

ered by the prior policy, sufficient to supply the subsequent policy, the latter would not be exonerated from any part of the sum, and the sole contingency on which a return of premium was to be due, would not occur at the commencement of the risk ; and it could not occur afterwards, for the insurer is always entitled to retain the premium, where he has been at any time liable to the extent of the insurance for which it was given—no matter how much that liability may be subsequently diminished.    This principle, that a return of premium for a short interest is never demandable unless the deficiency exist at the commencement of the risk, is an elementary one.    In *Tyrie* v. *Fletcher, Cowp.* 668, where there was a time policy on a trading voyage, as in the present case, Lord Mansfield decided that where a risk had once attached, there could be no apportionment or return of premium afterwards.    The rule in this respect is the same, whether it be a time policy or one on a designated voyage.    *Loraine* v. *Thomlinson, Doug.* 585. If, then, this principle be preserved and connected with the proposition contended for, that the clause under consideration abolishes entirely the common law and common sense rule of rateable distribution of a loss, we should have a case which I think no parties to a policy ever contemplated—the insurer receiving premium on account of a risk which the insured has taken particular pains to exonerate him from.    The admissions of the parties before the referee who reported the facts on which this question arises, as well as the universal usage, refute the proposition that subsequent insurers are not to contribute towards any loss till all prior policies are exhausted.    Perhaps I am wrong in supposing that this proposition is contended for by the insured, or that they do not admit that the words " without right to claim contribution from such subsequent assurers," would not reach a case of partial loss, happening while all the original interest was at risk, although the amount of such loss should be less than the sum insured by the prior policy.    But if this be so, it follows that the clause does not abolish entirely the common law rule of contribution ; that in the present case it existed in full force, notwithstanding the clause at some period of the adventure, and then the question occurs, who or what could sus-

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

pend it? I cannot see what power the owner had to sus-
pend it by acts subsequent to the contract, or what motive
he had to exercise the power, if he possessed it. Admitting,
as I do, that on a trading adventure he could withdraw his
own uninsured interest from the risk, does it follow that he
could discriminate between the interests of the different in-
surers, withdrawing one and leaving another at risk—con-
fining to particular goods policies that were over the whole
of them—thus separating what the law had blended, and de-
termining that risks which at one moment were equal, should
by his own act the next moment become unequal? And if
the owner has this power, what motive can be found for his
exercising it? and what proof shall be required that he has
exercised it? The principle that equality is equity, is what
establishes contribution for partial loss. Why should the in-
sured be presumed to have violated this principle, when he
has no motive for doing so? So far as his interests are af-
fected by the American clause, it is indifferent to him wheth-
er the loss fall on all the insurers or on some of them. Un-
der this clause it is not pretended that he could recover back
from any the premium which they had received; for the
risk is indivisible, and their policies had once attached. The
stipulation to return a relative proportion of the premium
for each month not attached is accidental, and forms no part
of the American clause ; besides, it applies only to time that
remains, after the whole risk is terminated. Both usage and
authority give this construction to it. *Hunter* v. *Wright*, 10
*Barn. & Cres.* 704, was a case where the stipulation in a
time policy for a year on a ship, was, that a part of the pre-
mium should be returned for every uncommenced month,
if the ship was sold or laid up. It was held that laying up,
meant laying up for the whole season, and where the vessel
had been laid up for several months during the year, but
was employed again within the year, the insured was not
entitled to any return premium. But whatever construction
be given to this stipulation, it should still be indifferent to
the insured whether he obtained the return premium on the
last policy, or rateably on all.

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

It seems to me, then, that in determining, as it is agreed on all hands it must be determined, that the American clause does not change the rule of contribution as to a partial loss, by all the interests on board, it must also be determined as a consequence that the common law principle of contribution is as applicable to all losses upon the common subject at risk, and to which the several policies have once attached, as it would be if the clause did not exist. In short, that every diminution of the insured interest, after the risk has commenced, is a diminution *pro rata* for the equal benefit of all the insurers ; and therefore the subsequent loss of a part only in value of the original value, to which the insurance applied, though it be the whole value then at risk, is necessarily in the nature of a partial loss, because it is in fact but a partial loss of the whole interest insured. That this was the construction given to the policies, by all the parties to them, is I think sufficiently manifest. The policies were, in all respects except dates and amounts, exactly alike—the rate of premium the same—a fact totally inconsistent with the material difference of liability now contended for. The loss was adjusted on the principle of equal liability, and so preferred by the insured as their claim against the respective insurers ; and more than all, the claim was compromised and paid by the subsequent insurers, on the principle on which it was adjusted by the broker. Perhaps the circumstances of the compromise with the Atlantic and Niagara companies, prevent the plaintiffs in error from availing themselves of the sums which they paid, notwithstanding those sums and the present judgment give to the insured more than their loss ; but the fact that these companies have paid on the principle of a distributive loss, furnishes the most striking evidence of the construction which all the parties must have given to these policies, and places the insured in the singular attitude of claiming for the subsequent insurers an exemption which they did not ask, which, because they did not possess, the insured has induced them to pay, and which it will not avail them now to have established.

In the conclusion of remarks already too extended, I will observe that the use of technical terms in marine insurances, which are not familiar to those whose knowledge of the subject is derived principally from litigations in respect to it, is apt to produce confusion and throw over the whole subject an appearance of greater intricacy and mystery than really belonged to it. Contracts for marine insurance are common law contracts, and, with some very few exceptions produced by established customs, are to be construed and controlled by the same rules that apply to other contracts with which we all are familiar. An insurance against loss by sea risk is substantially like an insurance against loss by any other risk; and if we apply to it the rules of contribution which are applicable to common cases of guaranty, we shall discover with greater distinctness, the principle on which different insurers, whose policies have once attached to the same subject, are afterwards to be treated throughout as cosureties, notwithstanding their policies are of different dates. Taking, for illustration, the case of sureties for a public officer, or for the sale of property, where the security required is for a greater sum than any one surety is able or willing to assume—as where $20,000 is the whole sum, and the sureties propose to assume $5000 each—it is clear that the liability of the several sureties in case of loss would be exactly the same, whether they all signed the same instrument, or separate instruments of the same date or of different dates. It is sufficient that they all relate to the same responsibility or risk. Therefore, if a demand arise for the whole or any part of the amount for which the guaranty is given, each surety must pay an equal sum; and if any thing occur to diminish the general responsibility or risk, it diminishes the responsibility or risk of each in the same ratio. Suppose, in the case put, of a guaranty for a debt, the debtor should pay half of it, or the creditor should release half of it, neither the debtor in the one case nor the creditor in the other could say that the payment or release should operate for the relief of one surety more than for another; for the law, disregarding any such intention, however manifested, would apply it rateably for the benefit of all—for

ALBANY,
Dec. 1835.

American Ins.
Company
v.
Griswold.

the surety first signing, equally as for the one last signing. On this principle precisely, in a case like the present, where there has been a diminution of the whole responsibility by the act of the insured, in withdrawing from the risk a part of the insured interest, the law will apply this diminution rateably to all the policies—to the first equally as to the last.

I have examined attentively the cases referred to on the argument, but find none of them that affect the conclusion to which I have come, except it be the remark of Mr. Justice Story, in *The Columbian Ins. Co.* v. *Catlett*, 12 *Wheat.* 394, which was purely speculative, on a state of facts which the case under consideration acknowledgedly did not present. I have therefore felt bound to treat the question as entirely open, and as one that has not been before judicially resolved.

My opinion is that the judgment of the supreme court is erroneous and should be reversed, and that a judgment should be given for the plaintiff below for only twenty forty-fifths of the sum lost by the seizure of the cargo on board at Callao, including of course the specie.

On the question being put, " Shall this judgment be reversed ?" *Senator* TRACY and *Senator* JONES voted in the *affirmative*, and the PRESIDENT of the Senate, the CHANCELLOR and *twenty senators* voted in the *negative*. Whereupon the judgment of the Supreme Court was AFFIRMED.